IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,425

In the Matter of IRA DENNIS HAWVER,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed November 14, 2014. Disbarment.

*Alexander M. Walczak*, Deputy Disciplinary Administrator, argued the cause, and was on the brief for the petitioner.

*Ira Dennis Hawver*, respondent, argued the cause pro se.

*Per Curiam*:  This is a contested attorney discipline proceeding against Ira Dennis Hawver, who was admitted to practice law in Kansas in 1975. A panel of the Kansas Board for Discipline of Attorneys made findings of fact and concluded Hawver violated the Kansas Rules of Professional Conduct (KRPC) in several respects while representing a client in a death penalty case. The panel majority and the office of Disciplinary Administrator recommend disbarment. One panel member recommends indefinite suspension. Additional background may be found in *State v. Cheatham*, 296 Kan. 417, 292 P.3d 318 (2013) (reversing convictions and remanding for new trial due to ineffective assistance of counsel).

The panel unanimously determined that Hawver violated KRPC 1.1 (2013 Kan. Ct. R. Annot. 446) (competence); 1.5 (2013 Kan. Ct. R. Annot. 503) (fees); 1.7(a)(2) (2013 Kan. Ct. R. Annot. 517) (conflict of interest); 1.16(a)(1) (2013 Kan. Ct. R. Annot. 569) (declining representation); 8.4(d) (2013 Kan. Ct. R. Annot. 655) (engaging in

1

conduct prejudicial to the administration of justice); 8.4(g) (2013 Kan. Ct. R. Annot. 655) (engaging in conduct adversely reflecting on lawyer's fitness to practice law). It further found Hawver failed to timely file an answer in the disciplinary proceeding in violation of Kansas Supreme Court Rule 211(b) (2013 Kan. Ct. R. Annot. 356). Hawver challenges some factual findings and conclusions, as well as the recommended discipline.

We hold that clear and convincing evidence establishes attorney misconduct and that disbarment is the appropriate discipline.

PROCEDURAL BACKGROUND

On August 20, 2013, the office of the Disciplinary Administrator filed a formal complaint against Hawver. A supplement to that complaint was filed October 8, 2013. Hawver filed an untimely answer to the formal complaint on October 30, 2013. Hawver appeared at the panel's November 19, 2013, hearing, after which the panel made the following findings of fact and conclusions of law, together with its recommendation for discipline:

"*Findings of Fact*

. . . .

"8.     In August, 2003, the respondent entered his appearance on behalf of Phillip Cheatham, in a pending criminal case, which included two felony drug charges. On December 12, 2003, the respondent advised Cheatham to leave town because the respondent believed the police were looking for an excuse to arrest Cheatham.

"9.     On December 13, 2003, Annette Roberson, Gloria Jones, and Annetta Thomas were shot. Ms. Roberson and Ms. Jones died from the gunshot wounds. Ms. Thomas survived.

2

"10.     After the shooting, Cheatham called the respondent and told the respondent that he was being implicated in the shooting. The respondent told Cheatham, 'Well, you know that's ridiculous because you're in Chicago and were headed that way.'

"11.     Thereafter, the State of Kansas charged [ ] Cheatham with two counts of murder, attempted murder, aggravated battery, and felon in possession of a firearm.

"12.     Later, in April 2005, Cheatham retained the respondent to represent him in the murder case. Cheatham agreed to pay the respondent a fee of $50,000. However, Cheatham did not pay the fee.

"13.     On June 24, 2005, the State amended its complaint to add one count of capital murder for the deaths of Roberson and Jones and, alternatively, a count of first-degree premeditated murder for each killing. The other charges were unchanged.

"14.     The respondent agreed to represent Cheatham in a capital murder case even though the respondent had not previously tried a capital murder case and he had not tried a murder case for 20 years.

"15.     Patricia Scalia, of the Kansas Board of Indigent Defense Services, contacted the respondent after he was retained to represent Cheatham. Ms. Scalia offered support to the respondent's representation. Ms. Scalia offered to retain co-counsel, investigators, consultants, and expert witnesses for the defense of Cheatham. The respondent declined Ms. Scalia's offer of assistance.

"16.     The respondent did not have and did not seek proper training to defend a capital murder case. Specifically, the respondent was unfamiliar with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter 'ABA Guidelines'). The ABA Guidelines establish standards for an attorney defending a death penalty case. The respondent failed to comply with the ABA Guidelines. Further, the respondent was not familiar with death-qualifying and life-qualifying the jury.

3

"17.     The respondent failed to properly investigate potential alibi witnesses and the respondent failed to file a notice of alibi defense, under K.S.A. 22-3218.

"18.     Prior to trial, the respondent did not reduce his regular case load in his practice. Additionally, the respondent was running for Governor of the State of Kansas.

"19.     All totaled, the respondent spent approximately 60 hours preparing for the capital murder trial.

"20.     Prior to trial, as part of the evidence of the felon in possession of a firearm charge, the prosecution agreed to enter into a stipulation that Cheatham had previously been convicted of a felony, rather than seek the admission of the details of Cheatham's voluntary manslaughter conviction. Despite the stipulation, during voir dire and again during his direct examination of Cheatham, the respondent informed the jury that Cheatham had previously been convicted of voluntary manslaughter. During trial, the respondent described Cheatham as a 'professional drug dealer' and a 'shooter of people.'

"21.     Regarding this issue, in this subsequent appellate decision, the Kansas Supreme Court stated:

'During the *Van Cleave* proceedings, Hawver gave conflicting explanations as to why he introduced details about the prior conviction. In a deposition prior to the evidentiary hearing, he testified that he informed the jury of the conviction because he believed the State would be able to introduce it during the guilt phase of trial because it was an aggravating factor the State would attempt to prove during the penalty phase. This misconception is evident by the following exchange:

'A.     [Hawver]: Well, I made the decision that, in a sense, it was a capital case, and since the jury would be informed that he had done what he had to do in capital cases, unlawfully, feloniously,

4

intentionally and with premeditation, kill more than one person, that's a capital murder requirement. Um, let's see. Um, where he would be—it would be stated that he had committed a crime that would bring him into the capital realm, I thought it was better to explain to them what the deal was rather than let them wonder what he had done.

'Q. [Cheatham's counsel]: And so if I understand you, please correct me if I misstate this, you understood that one of the aggravating factors that the State would attempt to prove if the penalty phase occurred was that Mr. Cheatham had on a prior occasion been convicted of this involuntary manslaughter?

'A. [Hawver]: I thought they would be able to do that during the guilt phase, the guilt phase.

'Q. [Cheatham's counsel]: And can you tell me under what theory you believed that evidence of involuntary manslaughter would have been admissible in the first phase?

'A. [Hawver]: The fact that it was a capital case.

. . . .

'A. [Hawver]: And in order to get a capital case, my understanding you have to have done something like that prior.

5

'Q.     [Cheatham's counsel]: All right. And so you
        believe that because they charged it as a capital
        case, that would give them the right to produce
        aggravating factors in the first phase of the trial?

'A.     [Hawver]: Correct.'

'Hawver then said he attempts to win cases by "telling the truth and letting the facts set, an understanding of the full scope of the presentation."'

"22.    During the closing argument, the respondent 'conceded that asking the jury to ignore Cheatham's background when determining guilt required "some sort of superhuman fiction."'

"23.    The jury convicted Cheatham of all the charges. During the closing argument of the penalty phase of the trial, the respondent told the jury that the killer should be executed. The jury sentenced Cheatham to death. Cheatham appealed, asserting that he was provided with ineffective assistance of counsel.

"24.    The Kansas Supreme Court bifurcated the ineffectiveness arguments from other issues on appeal and remanded the case to the district court for a *Van Cleave* hearing.

"25.    The respondent signed an affidavit prepared by Cheatham's new counsel. The respondent testified that the contents of the affidavit are accurate. The affidavit provided:

'1.     I am over the age of 18 and if called upon to do so, I am
        competent to testify to the things discussed in this affidavit.

'2.     I am an attorney in good standing in the State of Kansas.

6

'3.     In 2005 I was a practicing lawyer with a solo practice in Ozakawie [*sic*], Kansas in Jefferson County.

'4.     In April, 2005, I met with the accused Phillip Cheatham in the County jail where he was being held on murder charges in case number 03 CR 2635 in the Shawnee County, Kansas, District Court. The State had charged Mr. Cheatham with two counts of Murder in the first degree, Assault in the first degree, as well as other lesser charges. Mr. Cheatham requested that I represent him in the murder case.

'5.     In April 2005, I was a private attorney with a general trial practice. I had a busy practice in which I represented people in civil and criminal matters in Jefferson, Shawnee, Douglas, and other counties. In addition, I was a candidate for governor of the State of Kansas, and as such I was spending considerable time attending public appearances throughout the state of Kansas. I appeared at all political functions dress[ed] as President Thomas Jefferson. In the year preceding my run for Governor, I ran for Congress, and in each instance, I was in the race to educate the public about the war in Iraq.

'6.     At the time I entered my appearance to represent Mr. Cheatham in his capital murder case I had considerable experience in a courtroom, but I had little experience in the preparation and trial of a murder case (the last murder case I handled was in 1985) and NO experience working on a capital murder case. I did not appreciate the differences between handling a murder case and a capital murder case when I agreed to represent Mr. Cheatham.

'7.     At the time I entered my appearance I did not consult with the BOARD OF INDIGENTS' DEFENSE to explore whether funding might be available to support my representation of the

7

client. Nor did I meet with any person with experience in the pretrial investigation of a capital case nor did I meet with any person about the complexities of trying a capital case. In truth, I should not have accepted the case given my lack of capital trial experience, and the unavailability of necessary funding which I now understand is required in the preparation and trial of cases, such as this one in which the client faces a possible death sentence.

'8.     At the time I entered my appearance I did not review any standards for the performance of defense counsel in a capital case. More specifically, I did not review the American Bar Associations Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. I did not read state or federal cases, such as *Wiggin v. Smith*, 539 U.S. 510 (S. Ct. 2003) which would have provided guidance regarding the requirements under the law for the pretrial investigation of mitigating evidence, and the requirements under the law for the trial presentation of mitigating evidence.

'9.     Mr. Cheatham did not have any funds with which to pay for my services nor did he have funds to pay for any investigation of his case. I agreed to represent Mr. Cheatham on the murder charges in exchange for his promise to pay $50,000 for my time, if he was found not guilty on the charges.

'10.    On June 30, 2005 the prosecuting attorney filed notice to seek the death penalty in the case. This occurred following the client's failure to accept a plea offered by the prosecuting attorney. Given the lurid publicity and the history of the accused, I was not surprised when the State made the case against Mr. Cheatham a capital case.

8

'11. After the State designated the case a capital case I understand that I received a call from Pat Scalia, director of the Board of Indigents' Defense, who offered to assist with funding. I do not have a specific memory of this call but I would not contest Ms. Scalia's assertion that this offer was made. I did not talk to her at any other time during my representation of Mr. Cheatham.

'12. At the time of my entry of the case, I was generally aware of the *Marsh* decision, in which the Kansas Supreme Court struck down the statutory scheme in death penalty cases on or about December 17, 2004.

'13. However, I never filed a motion asking the trial court to dismiss the death penalty pursuant to the 2004 *Marsh* decision. This was not a strategic decision, it was an oversight, and therefore in error. My failure to raise this issue before the trial began in August 2005 prejudiced my client.

'14. On June 30, 2005 the preliminary hearing was held in the above captioned case. I represented Mr. Cheatham at the hearing. A young lawyer who was interning at my office attended the hearing with me. This was the only opportunity I would have to see the State's witnesses as I was without funds to conduct a pretrial investigation of the case. It was the only point in the pretrial phase or the trial phase when I had co-counsel. His role was limited to attending the hearing and taking notes.

'15. Based on my review of the police reports, the character of the witnesses and a possible alternative suspect, I did not believe that State had a strong case against my client. I considered only one theory of defense and failed to explore other possible theories of defense. I now understand that this decision falls short of the expectations of counsel in a capital case.

9

16. My theory before trial and at trial was that my client was innocent and that a man named Todd Atkins was guilty. In my case, I took on the burden of proving the guilt of another man. I believed it was in the client's best interest to get to trial as soon as possible. I did not see how time or investigation would change the theory of the case; therefore I never asked the court for time to investigate the case or to conduct an investigation of the client's life history. I believe if I had asked for additional time to prepare the case the judge would have granted such a request.

17. Therefore, this capital murder trial began less than 3 months after preliminary hearing. I now understand that on average capital cases take 20 months to prepare for trial.

18. The truth is I banked on winning the case, and therefore I failed to prepare any case in the event of a finding of guilt by the jury. My decision to go forward as fast as we could was motivated by a false sense of strength of my theory, but should not be considered as a well thought through strategy. Proceeding as I did was done in error and my decision to forego a thorough first and second phase investigation prejudiced my client. In fact, I now know it made it more likely than not that a jury faced with no meaningful mitigation would render death sentences in a double homicide.

19. My decision not to hire an investigator to assist in the investigation of the trial facts was because I had no funds with which to hire an investigator. Truthfully, I did not see what I could have asked an investigator to do as my theory was Todd Atkins committed the murder in a jealous rage. I did not have any co-counsel to consult with or to assist in testing my theory of defense. I now understand that my failure to consider other trial

10

strategies was prejudicial to my client. In addition, I failed to consider how my defense might impact a penalty phase of the case.

'20.  The client did identify a possible alibi witness, but without funds to hire an investigator I was unable to locate this potential witness. I failed to ask for time to find this potential exonerating witness. I failed to ask the court or the BOARD OF INDEGENTS' DEFENSE to provide the funds to locate witnesses th[at] may have been able to account for the time of the accused in the critical time frame and therefore permitted the jury to here [*sic*] the evidence of alibi.

'21.  I was not able to evaluate the strength of my theory of defense by employing an investigator and putting him into the field to question the scores of witnesses which may have had information to share about the day of the crime, the credibility of certain key witnesses, the relationship of my client with the Topeka Police department and the resulting prejudice, the potential alibi witnesses or other critical evidence which would have uncovered with the help of competent investigator. I admit that I did not provide effective assistance of counsel when I decided to forgo a comprehensive investigation of the trial facts.

'22.  The trial in this case lasted approximately 10 days, and I spent long days working on the case in the days leading to the trial, and during the trial. The trial began on August 29, 2005, and the jury returned a sentencing verdict on September 12, 2005. I would estimate I spent at least 200 hours on the preparation and in the trial of the first phase of the case. Many of these hours were accrued during the approximately 10 day trial as the days which required 14-16 hour days.

11

23. I did not have co-counsel during either the pretrial or the trial stages of this case. I did not know that it is standard practice for the accused in a capital case to have two lawyers who are assigned to work on his case. I had not read the applicable case law or reviewed practice standards before concluding I would not seek the assistance of competent and experienced co-counsel. My failure to seek co-counsel in a capital murder case was below any reasonable professional standard as set out in Guideline 4.1 of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases.

24. Prior to this case, I had never selected a jury in a capital case. I had never seen a jury selected in a capital case. I did not prepare for the capital jury selection and approached the process with a single goal in mind which was to challenge the State's case and lead the jury to an acquittal of the client.

25. I did not become familiar with the requirements of "death qualification" questioning. At the time of the trial I was not familiar with the techniques to 1) expose those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the client was death eligible, regardless of the individual circumstances of my case; 2) uncover those prospective jurors who would be unable to give meaningful consideration to mitigating evidence; and 3) rehabilitate potential jurors whose initial indications of opposition to the death penalty made them possibly excludable.

26. I neither considered nor contacted a capital jury expert to assist with the jury selection. I now know such experts are available in Lawrence, Kansas. I did not seek funding for this type of expert from the court or from the Kansas Board of Indigents' Defense.

12

'27.    In truth, I was not aware of the obligations of defense counsel in questioning jurors to determine their views on the death penalty versus life in prison. I was not prepared to challenge jurors based on the capital case law. My failure to adequately prepare for capital jury selection prejudiced my client's case, and was a grievous error.

'28.    I did not seek assistance from the Kansas capital unit, to determine whether or not they could have provided competent and/or learned co-counsel, nor did I seek help from the judge to assist me in finding learned capital co-counsel. As I saw it, the client did not have funds to pay for co-counsel, so the only option I had was to try the case alone or turn the case down.

'29.    I did not have a Legal Representation Plan as outlined in 4.1 of the ABA Guidelines of the Appointment and Performance of Defense Counsel in Capital Cases. Today, I understand that the ABA guidelines have been recognized by the U.S. Supreme Court in the *Wiggins* decision as the standards of representation for all capital defense counsel. I did not consider co-counsel, my lack of experience or the need for funds to pay for the representation as obstacles that should have prohibited my representation of the client.

'30.    I failed to conduct a penalty phase investigation. After the jury returned a verdict of guilty on the murder charges, I contacted Phillip Cheatham's mother in Kansas City, and asked her to travel from Kansas City to Topeka so that she could tell the jury she loved her son and would suffer if he was executed. Although I asked Mr. Cheatham's mother to gather up other possible witnesses and bring them to court the next morning she was the only witness to appear 12 hours after my call to her. Mr. Cheatham and his mother were therefore the only witnesses I

13

was able to present in the penalty phase of the trial. My failure to conduct a penalty phase investigation fell below the standards of practice and caused grievous harm to my client.

'31.    I admit I used a flawed and prejudicial argument in the penalty phase with a jury that had just determined my client had killed two women, and then attempted to kill a third. Despite my knowledge that the jury had found my client guilty beyond a reasonable doubt of double murder, I told the jury I thought the killer should be executed for the crimes. This argument was clearly prejudicial to my client, who the jury believed, as evidenced by their verdict, was the killer.

'32.    I had a single mitigator to offer the jury in sentencing, and that was my argument that my client was innocent. I admit that this was all I could offer given the failure to conduct any investigation into the life of my client. I admit that a jury, which had just decided my client was in fact guilty of the murders, had already rejected my theory of the case. I admit that my decision to present INNOCENCE as a mitigator was prejudicial to the client and may have even angered the jurors. I admit I did not have sufficient time or experience to weigh the advantages and/or disadvantages of this course of action.

'33.    In my experiences as a trial lawyer, I had never been called on to investigate the client's life history, analyze the information and then form a trial strategy based on the client's life history. I lacked the knowledge and the experience to present a competent mitigation case or to form the persuasive arguments that would assist the jury in forming a sentencing decision that would allow a sentence in prison for life without parole. The truth is I would not know how to begin such an investigation, nor would I know how to use the information to assist the jury in its job.

14

'34.   I did not attend training at either the local or at the national level to gather information about how to conduct a penalty phase investigation.

'35.   Prior to this case I was not aware that there were mitigation specialists who are trained to conduct life investigations, and work with the trial teams to interview mitigation witnesses, prepare witnesses for trial, find experts, gather documents and in some cases testify. I did not contact or hire any mitigations [*sic*] investigator or mitigation specialist to assist me in the preparation and presentation of the case. I now understand that my failure to hire a mitigation specialist was below the professional standards set out for lawyers who accept capital appointments and/or take on capital cases.

'36.   I failed to hire a mitigation specialist and I failed to seek the necessary funding from the court or from the BOARD OF INDIGENTS' DEFENSE. My failure to conduct an investigation was a grievous error and was in violation of the standards for the performance of defense counsel in capital cases.

'37.   I did not collect any education, medical, mental health, employment, juvenile, criminal justice or other records of Mr. Cheatham's during the 5 months I represented him. In all honesty, I did not know it was standard practice in the defense of capital cases to collect the client's records.

'38.   I did not conduct interviews of the family of my client to learn about his birth, education, parental absence, parental crime and addiction, traumas in his life, criminalization by family and/or community, the impact of poverty and/or the impact of a violent inner city community on his development. I did not know that an

15

in-depth social history is standard practice in a death penalty case.

'39.   I did not consider seeking the help of any expert in this case. I did not know it was standard practice in a mitigation investigation to investigate intelligence, brain damage, and mental health issues. I admit I do not have the necessary expertise to evaluate or assess a client to determine if he is mentally ill or brain damaged without the assistance of experts.

'40.   I was not familiar with capital instructions prior to this case, and therefore was not familiar with how to prepare mitigation instructions nor did I appreciate the fact that a jury may consider any fact about the client's life as mitigating, or in other words, as a reason to give a life sentence and not a death sentence. If I had understood the law and the range of possible mitigators which existed in my client's life, I would have submitted additional evidence to support a host of other possible mitigation instructions. My failure to offer more than one mitigator was very prejudicial to my client, and left the jury with a false impression about his life. In the end it gave the jury nothing upon which to base a life verdict.'

"26.   During the *Van Cleave* hearing, the State stipulated that the respondent provided ineffective assistance of counsel to Cheatham during the sentencing phase of the trial but disputed that Cheatham received ineffective assistance of counsel during the guilt phase of the trial. The *Van Cleave* court upheld the convictions but reversed the death sentence.

"27.   On January 25, 2013, the Kansas Supreme Court issued an opinion, overturning Cheatham's conviction based on ineffective assistance of counsel.

16

"28.    After the Kansas Supreme Court's opinion in *State v. Cheatham*, was released, the disciplinary administrator docketed a complaint against the respondent. Thereafter, on March 2, 2013, the respondent provided a response to the initial complaint. In his response, the respondent denied violating the Kansas Rules of Professional Conduct.

"29.    On August 20, 2013, Mr. Walczak filed a formal complaint. The respondent failed to provide a written answer to the formal complaint within 20 days. Thereafter, on October 8, 2013, Mr. Walczak filed a supplement to the formal complaint, alleging that the respondent failed to file an answer to the formal complaint.

"30.    On October 30, 2013, the respondent filed a 'second answer to formal complaint and answer to the supplement to formal complaint.' Rather than admit or deny the allegations contained in the formal complaint and the supplement to the formal complaint, the respondent's pleading was more akin to a trial brief.

"*Conclusions of Law*

"31.    While the Kansas Supreme Court has previously determined that the respondent provided ineffective assistance of counsel in his defense of Cheatham, the standard for determining whether the respondent engaged in misconduct and, thus, violated the Kansas Rules of Professional Conduct, requires a different analysis.

"32.    In order to determine whether the respondent violated the Kansas Rules of Professional Conduct, the hearing panel must determine whether clear and convincing evidence supports the conclusions of specific violations of the Kansas Rules of Professional Conduct.

"33.    The hearing panel concludes, based upon the above findings of fact, specifically including the affidavit executed by the respondent, that clear and convincing evidence supports the conclusions that the respondent violated KRPC 1.1, KRPC 1.5, KRPC 1.7(a)(2), KRPC 1.16(a)(1), KRPC 8.4(d), KRPC 8.4(g), and Kan. Sup. Ct. R. 211(b), as detailed below.

17

"KRPC 1.1

"34.     Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The respondent was not competent to represent Cheatham.

'a.     The respondent had not tried a murder case for 20 years and had no experience in death penalty cases.

'b.     The respondent did not appreciate the differences between trying a murder case and trying a capital murder case.

'c.     The respondent did not obtain any training to defend a capital murder case.

'd.     The respondent did not reduce his other caseload in order to devote additional time to the representation of Cheatham.

'e.     Throughout the period of representation, the respondent was running for Governor of the State of Kansas.

'f.     The respondent was unfamiliar with the ABA Guidelines.

'g.     The respondent failed to hire co-counsel, an investigator, consultants, a capital jury expert, a mitigation specialist, and expert witnesses.

'h.     The respondent did not accept assistance from the Board of Indigents' Defense Services.

18

'i.     The respondent failed to conduct a thorough investigation of the facts.

'j.     The respondent failed to assemble a trial team.

'k.     Rather than hire a mental health professional and without any experience, the respondent judged Cheatham to be mentally healthy.

'l.     The respondent did not know that he could compel the attendance of out-of-state witnesses.

'm.    The respondent failed to track the cell phone to determine Cheatham's location at the time of the murders.

'n.     The respondent failed to properly investigate possible alibi witnesses. Additionally, the respondent failed to file a notice of alibi.

'o.     The respondent was not familiar with how to death-qualify and life-qualify a jury.

'p.     While the respondent was familiar with the *Marsh* decision, he failed to file a motion challenging the death penalty.

'q.     The respondent did not prepare a legal representation plan.

'r.     The respondent spent approximately 60 hours preparing for the capital murder trial.

's.     During trial, the respondent described Cheatham as a "professional drug dealer" and a "shooter of people."

19

't.     The respondent believed that the manslaughter conviction would be admitted during the guilt phase of the trial.

'u.     The respondent was not familiar with capital jury instructions.

'v.     The respondent did not conduct investigation for the sentencing phase.

'w.     During the sentencing phase of the trial, the respondent presented only one mitigator—Cheatham's innocence.

'x.     In the closing argument of the sentencing phase, after the same jury had concluded Cheatham was guilty of the murders, the respondent told the jury that they ought to execute the killer.'

The respondent failed to represent Cheatham with the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.1.

"KRPC 1.5 and KRPC 1.7(a)(2)

"35.     KRPC 1.5 provides that '[a] lawyer's fee shall be reasonable.' KRPC 1.7(a)(2) provides:

'(a)     Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . . .

(2)     there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client,

20

a former client or a third person or by a personal interest of the lawyer.'

"36.     The respondent charged Cheatham a fee of $50,000. The Kansas Supreme Court previously concluded that the fee was not a contingent fee, but rather a flat fee. Charging a flat attorney fee in a capital murder defense was unreasonable and created a conflict of interest.

"37.     The ABA Guidelines 'unequivocally disapprove of flat fees in death penalty cases precisely because such fee arrangements pit the client's interests against the lawyer's interest in doing no "more than what is minimally necessary to qualify for the flat payment."' Despite the fact that Cheatham did not pay the fee, charging a flat fee in this case became a disincentive to the respondent to do more than what is minimally necessary to qualify for the flat payment. Accordingly, the hearing panel concludes that the respondent's flat fee was unreasonable and created a concurrent conflict of interest, in violation of KRPC 1.5 and KRPC 1.7(a)(2).

"KRPC 1.16(a)(1)

"38.     A 'lawyer shall not represent a client . . . if the representation will result in a violation of the Kansas Rules of Professional Conduct.' KRPC 1.16(a)(1). In this case, accepting the representation of Cheatham resulted in a violation of KRPC 1.1. By accepting the representation of Cheatham, the respondent violated KRPC 1.1, as the respondent was not competent to represent a defendant in a capital murder case, as detailed in paragraph 34 above. The hearing panel concludes that the respondent violated KRPC 1.16(a)(1) in this regard.

"KRPC 8.4(d)

"39.     KRPC 8.4(d) provides that '[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' The respondent engaged in conduct that is prejudicial to the administration of justice when he incompetently represented Cheatham in a capital murder case. As a direct result of the

21

respondent's ineffectiveness, the Kansas Supreme Court reversed Cheatham's conviction for capital murder and the case will have to be tried again. Causing a retrial in a capital murder case is significant prejudice. Thus, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"KRPC 8.4(g)

"40.     'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The respondent engaged in conduct that adversely reflects on his fitness to practice law when he informed the jury during the guilt phase that Cheatham was a 'professional drug dealer' and a 'shooter of people.' Further, the respondent engaged in conduct that adversely reflects on his fitness to practice law when, during the sentencing phase of the jury trial, the respondent told the jury that they ought to execute the killer. The hearing panel concludes that the respondent violated KRPC 8.4(g).

"Kan. Sup. Ct. R. 211(b)

"41.     The Kansas Supreme Court Rules require attorneys to file answers to formal complaints. Kan. Sup. Ct. R. 211(b) provides the requirements:

'The respondent shall serve an answer upon the Disciplinary
Administrator within twenty days after the service of the complaint
unless such time is extended by the Disciplinary Administrator or the
hearing panel.'

Kan. Sup. Ct. R. 211(b). The respondent violated Kan. Sup. Ct. R. 211(b) by failing to file a timely written answer to the formal complaint. The respondent's response to the initial complaint was not an answer to the formal complaint. The respondent did not file an answer to the complaint until October 30, 2013, 71 days after the formal complaint was filed. Accordingly, the hearing panel concludes that the respondent violated Kan. Sup. Ct. R. 211(b).

22

"42.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"43.     *Duty Violated*.  The respondent violated his duty to his client to provide competent representation. The respondent violated his duty to his client to refrain from engaging in conflicts of interest. The respondent violated his duty to the public and to the legal profession to maintain his personal integrity.

"44.     *Mental State*.  The respondent intentionally violated his duties.

"45.     *Injury*.  As a result of the respondent's misconduct, the respondent caused actual injury to the administration of justice. As a result of the respondent's misconduct, a capital murder case has been remanded for a second trial.

"Aggravating and Mitigating Factors

"46.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"47.     *Prior Disciplinary Offenses*.  In 2003, the respondent participated in the attorney diversion program, under Kan. Sup. Ct. R. 203(d), for having violated KRPC 1.1 (competence).

"48.    *A Pattern of Misconduct*.  Throughout the representation of Cheatham, the respondent engaged in misconduct. As such, the hearing panel concludes that the respondent engaged in a pattern of misconduct.

"49.    *Multiple Offenses.*  The respondent violated KRPC 1.1, KRPC 1.5(a), KRPC 1.7(a)(2), KRPC 1.16(a)(1), KRPC 8.4(d), KRPC 8.4(g), and Kan. Sup. Ct. R. 211(b). The hearing panel concludes that the respondent engaged in multiple offenses.

"50.    *Substantial Experience in the Practice of Law*.  The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1975. At the time of the misconduct, the respondent had been practicing law for nearly 30 years.

"51.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"52.    *Absence of a Dishonest or Selfish Motive.*  The respondent's misconduct was not motivated by dishonesty or selfishness.

53.    *The Present and Past Attitude of the Attorney as Shown by the Attorney's Cooperation During the Hearing and the Attorney's Full and Free Acknowledgment of the Transgressions.*  By signing the affidavit, the respondent acknowledged engaging in misconduct. Further, during the formal hearing, the respondent acknowledged that he violated the Kansas Rules of Professional Conduct and the Kansas Supreme Court Rules. However, during the hearing on the formal complaint, the respondent repeatedly testified that the reason the hearing was being held was because Cheatham was convicted and that had Cheatham been acquitted, no hearing would have been held.

"54.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

24

'4.51    Disbarment is generally appropriate when a lawyer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client.'

"*Recommendation*

"55.    At the hearing on the formal complaint, the deputy disciplinary administrator recommended that the respondent be disbarred. The respondent recommended that he be directed not to take any additional murder cases and that he be allowed to continue to practice law.

"56.    After careful consideration of the facts and rule violations, a majority of the hearing panel recommends that the Kansas Supreme Court enter an order of disbarment.

"57.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

The panel's presiding officer, Philip D. Ridenour, filed a separate concurring opinion. David H. Moses, a panel member, filed a separate concurring and dissenting opinion, agreeing with the findings and conclusions regarding the violations, but recommending indefinite suspension as the appropriate discipline.

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the disciplinary panel's findings, and the parties' arguments to determine whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d

375 (2011); see Supreme Court Rule 211(f) (2013 Kan. Ct. R. Annot. 356). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Hawver was given adequate notice of the formal complaint and the supplement to the formal complaint. He was also given adequate notice of the panel's hearing and the hearing before this court.

*Exceptions to the panel's report*

Hawver filed exceptions to portions of the panel's final hearing report. See Supreme Court Rule 212(c)(2) (2013 Kan. Ct. R. Annot. 376). We consider those first.

When a respondent does not take exception to a finding it is deemed admitted. *In re Woodring*, 289 Kan. 173, 174-75, 210 P.3d 120 (2009). But when an exception is taken, the panel's findings are not typically deemed admitted, so the court must determine whether the disputed findings are supported by clear and convincing evidence. *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008). In making this determination, the court does not weigh conflicting evidence, assess witness credibility, or redetermine questions of fact. *In re Kline*, 298 Kan. 96, 113-14, 311 P.3d 321 (2013). If a disputed finding is supported by clear and convincing evidence, it will not be disturbed. *In re Mintz*, 298 Kan. 897, 902, 317 P.3d 756 (2014); *In re Frahm*, 291 Kan. 520, 525, 241 P.3d 1010 (2010); 285 Kan. at 1106.

Hawver's pleadings make it difficult at times to decipher exactly what exceptions he has to the panel's specific findings and conclusions. For example, he broadly states exception "to each and every finding that he violated the Kansas Rules of Professional

26

Conduct (KRPC) *to a degree requiring discipline*." (Emphasis added.) This could mean the facts are admitted and the only dispute is about the panel's recommendations for discipline. Hawver takes further exception "to any disciplinary finding that he committed improper conduct *at the direction of a client*, which should be subject to disciplinary action." (Emphasis added.) This could mean the dispute centers only on those aspects of the case defense in which Cheatham participated or, again, only the recommended discipline. Hawver offers this explanation:

> "When the client retained respondent, the client was exercising his rights to select counsel of his choice, not state appointed counsel, and to exercise his decisions in his defense tactics against the state's charges of murder of capital murder. Respondent takes constitutional exception to the state's action that the state can lawfully censor, punish, or deprive the respondent of a property right in the practice of law for his defense of his client, as directed by his client, under the First and Sixth Amendments of the United States Constitution."

Hawver also makes generalized exceptions to some of the panel's specific findings. These are: Paragraph 16 (failure to comply with ABA death penalty guidelines); Paragraph 17 (failure to properly investigate potential alibi witnesses and file the statutorily required notice of alibi defense); Paragraph 19 (total hours preparing for capital murder trial); Paragraph 20 (informing potential jury pool that client had prior voluntary manslaughter conviction, was a "professional drug dealer" and a "shooter of people"); Paragraph 21 (quoting from this court's *Cheatham* decision); Paragraph 22 (quoting from Hawver's closing argument during Cheatham's trial); Paragraph 29 (noting Hawver's failure to timely file answer to August 2013 formal complaint); and Paragraph 30 (noting Hawver's October 2013 answer to supplemental formal complaint failed to admit or deny allegations and was "more akin to a trial brief"). But little detail is offered to explain the exception, and there is insufficient citation to the evidentiary record from which to base an attack against a specific finding.

Supreme Court Rule 212(e)(4) (2013 Kan. Ct. R. Annot. 377) provides that a respondent who files exceptions to the final hearing report, but does not file a brief, "will be deemed to have conceded that the findings of fact made by the hearing panel are supported by the evidence." See also *Bishop*, 285 Kan. at 1106 (exception deemed abandoned or waived if respondent's brief advances argument without proper citation to the record to support that exception). Hawver's briefing lacks this required argument and citation to the record to appropriately pursue his exceptions. He does not reference—as he must—the evidence presented at the hearing that might support his exceptions.

For example, the statement of facts in Hawver's brief simply repeats what he stated in a prehearing "Second Answer to Formal Complaint and Answer to the Supplement to Formal Complaint"—a pleading prepared before the evidentiary hearing. This is wholly inadequate to preserve Hawver's enumerated exceptions to the panel's factual findings. Similarly, Hawver's brief is devoid of proper citation to the hearing panel's evidentiary record.

We hold the panel's findings of fact are deemed admitted to the extent they are not implicated by the legal arguments Hawver raises in his brief. See *In re Small*, 296 Kan. 759, 793, 294 P.3d 1165 (2013).

*The record fully supports the panel's findings of misconduct*

Even if we ignore Hawver's procedural failures due to his failure to properly challenge his enumerated exceptions, we note he did not take specific exception to other specific findings made by the panel, which by themselves are sufficient to establish clear and convincing evidence of attorney misconduct. Those unchallenged findings are: Paragraph 12 (fee agreement with Cheatham); Paragraph 14 (no prior experience in a

28

death penalty case); Paragraph 15 (Scalia phone call); Paragraph 18 (failure to reduce his regular caseload); Paragraph 23 (statement to the jury during the penalty phase that the killer should be executed); and, most notably, Paragraph 25 (Hawver's affidavit, prepared before Cheatham's *Van Cleave* hearing that admits the substantive facts relied on by the disciplinary panel, including Hawver's admissions of professional incompetence in handling Cheatham's case).

The *Van Cleave* affidavit recited in Paragraph 25 in particular provides clear and convincing evidence of attorney misconduct. In it, Hawver admitted the essential facts comprising the allegations of misconduct against him, *e.g.*, "I did not appreciate the differences between handling a murder case and a capital murder case when I agreed to represent Mr. Cheatham." (Affidavit ¶ 6); "In truth, I should not have accepted the case given my lack of capital trial experience, and the unavailability of necessary funding which I now understand is required in the preparation and trial of cases, such as this one in which the client faces a possible death sentence." (Affidavit ¶ 7); "Proceeding as I did was done in error and my decision to forego a thorough first and second phase investigation prejudiced my client. In fact, I now know it made it more likely than not that a jury faced with no meaningful mitigation would render death sentences in a double homicide." (Affidavit ¶ 18); "I now understand that my failure to consider other trial strategies was prejudicial to my client. In addition, I failed to consider how my defense might impact a penalty phase of the case." (Affidavit ¶ 19); "I admit that I did not provide effective assistance of counsel when I decided to forgo a comprehensive investigation of the trial facts." (Affidavit ¶ 21); "In truth, I was not aware [of] the obligations of defense counsel in questioning jurors to determine their views on the death penalty versus life in prison. I was not prepared to challenge jurors based on the capital case law. My failure to adequately prepare for capital jury selection prejudiced my client's case, and was a grievous error." (Affidavit ¶ 27); "My failure to conduct a penalty phase investigation fell below the standards of practice and caused grievous harm to my client." (Affidavit ¶ 30);

"Despite my knowledge that the jury had found my client guilty beyond a reasonable doubt of double murder, I told the jury I thought the killer should be executed for the crimes. This argument was clearly prejudicial to my client, who the jury believed, as evidenced by their verdict, was the killer." (Affidavit ¶ 31); "I now understand that my failure to hire a mitigation specialist was below the professional standards set out for lawyers who accept capital appointments and/or take on capital cases." (Affidavit ¶ 35); and "My failure to conduct an investigation was a grievous error and was in violation of the standards for the performance of defense counsel in capital cases." (Affidavit ¶ 36).

At the panel's hearing, Hawver repeatedly confirmed this affidavit's accuracy, *e.g.*, "[Hawver]: Well, it isn't false. I don't see anything in here is false." And adding to these admissions from the affidavit are: (1) the unchallenged testimony presented by the Disciplinary Administrator's office of Patricia Scalia, state director for the Board of Indigents' Defense Services, and Ron Evans, chief defender for the State of Kansas Death Penalty Unit; (2) Hawver's sworn testimony in the *Van Cleave* proceeding; and (3) the panel's findings, which are deemed admitted due to Hawver's failure to properly challenge them in his exceptions.

Taken together, the record supports the panel's factual findings and establishes by clear and convincing evidence that Hawver violated KRPC 1.1 (2013 Kan. Ct. R. Annot. 446) (competence); 1.5 (2013 Kan. Ct. R. Annot. 503) (fees); 1.7(a)(2) (2013 Kan. Ct. R. Annot. 517) (conflict of interest); 1.16(a)(1) (2013 Kan. Ct. R. Annot. 569) (declining representation); 8.4(d) (2013 Kan. Ct. R. Annot. 655) (engaging in conduct prejudicial to the administration of justice); 8.4(g) (2013 Kan. Ct. R. Annot. 655) (engaging in conduct adversely reflecting on lawyer's fitness to practice law); and Kansas Supreme Court Rule 211(b) (2013 Kan. Ct. R. Annot. 356). Each of the panel's findings is fully supported by the record under the applicable standard.

30

*Hawver's First Amendment Challenge*

Moving next to Hawver's legal challenges, he first claims attorney discipline in this case would infringe his First Amendment rights. He argues attorney advocacy "is among the purest forms of protected First Amendment advocacy"; that the United States Supreme Court has "recognized the unlawfulness of a state court using the power of attorney discipline to punish [a] criminal defendant's attorney's lawful exercise of constitutional speech protections"; and "[t]he US Supreme Court has determined that the constitution protects the respondent's conduct in precisely the circumstances that the disciplinary tribunal has recommended that the respondent be disbarred."

Hawver's argument appears to be that his conduct in representing Cheatham was protected speech under the First Amendment, which in turn protects him from disciplinary action for engaging in it. But this argument is without merit because neither the nonexpressive aspects of the Cheatham representation nor Hawver's in-court advocacy are protected speech under these facts.

An attorney's speech is limited both in and outside the courtroom. See *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) (opinion of Rehnquist, C.J.). "It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed." 501 U.S. at 1071. And even a lawyer's out-of-court advocacy may be subject to limitation when it conflicts with ethics rules that serve substantial government interests, such as guaranteeing criminal defendants' rights to fair trials, or protecting public confidence in the legal system. See 501 U.S. at 1071, 1075-76 (government interest in preserving right to fair trial prevailed over attorney's First Amendment interest in statements to press substantially likely to affect trial's outcome or prejudice veniere panel); *In re Landrith*, 280 Kan. 619, 638-39, 124 P.3d 467 (2005) (First Amendment not

31

defense to discipline for attorney's false and inflammatory accusations in pleadings filed with the court against judges, attorneys, court staff, and others).

Hawver's First Amendment argument is easily addressed simply by determining whether the conduct at issue is protected speech, and, if so, whether the rule that punishes it serves a substantial State interest that outweighs the lawyer's First Amendment interest in the speech. See *Gentile*, 501 U.S. at 1034-35, 1076. If the conduct at issue is not protected speech, then the second analysis is unnecessary.

Many of the deficiencies the panel found involved nonexpressive conduct, including Hawver's failure to investigate for the guilt and penalty phases of Cheatham's case, inadequately preparing for trial, failure to file an alibi notice, failure to seek out or accept financial assistance for trial preparation, and failure to devote sufficient time to the case. The free speech guarantee extends to the spoken and written word and to conduct "'sufficiently imbued with elements of communication . . . .'" *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989). But whether conduct is so imbued depends on whether the actor intended to convey a particular message and whether "'the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404. The nonexpressive conduct in this case clearly was not intended to convey any particular message, so it is not protected speech. Imposing attorney discipline for this nonexpressive conduct does not implicate First Amendment concerns.

On the other hand, some of the deficiencies involved expressive conduct, including telling potential jurors that Cheatham was a drug dealer and had previously been convicted of voluntary manslaughter for shooting and killing another person; telling the jury during the guilt phase it would take "superhuman" efforts to see past Cheatham's criminal history to find him not guilty; and telling the jury during the penalty phase that it

32

should execute the person who committed the crimes for which it had just found Cheatham guilty. But this expressive conduct also was not protected speech.

A lawyer who undertakes a duty to act only in the client's best interests possesses no First Amendment interest in such in-court speech. See *Mezibov v. Allen*, 411 F.3d 712, 720 (6th Cir. 2005), *cert. denied* 126 S. Ct. 1911 (2006) (attorney retains no personal First Amendment rights when representing clients in courtroom proceedings); see also *In re Sawyer*, 360 U.S. 622, 646-67, 79 S. Ct. 1376, 3 L. Ed. 2d 1473 (1959) (Stewart, J., concurring) (reasoning a lawyer's "[o]bedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech").

In *Mezibov*, the court faced the question whether an attorney may claim First Amendment protection on his own behalf for certain courtroom statements attacking the prosecutor and prosecution witnesses made while defending his client in a criminal case. In answering this question in the negative, the court explained that an attorney "voluntarily accept[s] almost unconditional restraints on his personal speech rights, since his sole raison d'etre [is] to vindicate his client's rights." 411 F.3d at 720. The court reasoned that this undertaking is "in absolute conflict with [the attorney] exercising free speech," noting the attorney's duty within the attorney-client relationship is to make arguments only for the client's benefit. 411 F.3d at 719. As the *Mezibov* court noted, an attorney's challenge of a restriction on speech during a judicial proceeding is "grounded in the rights of the client, rather than any independent rights of the attorney." 411 F.3d at 718.

We hold that the First Amendment provides no protection for Hawver's misconduct in the *Cheatham* case. This makes it unnecessary to consider whether the rules at issue serve a substantial State interest that outweighs the lawyer's First Amendment interest in the speech. But even if we were to take that analytical path for

33

some of Hawver's statements during the trial, this court has held that the State may restrict a lawyer's exercise of personal rights when "a lawyer's unbridled speech amounts to misconduct that threatens a significant state interest." *In re Landrith*, 280 Kan. at 638-39 (First Amendment not defense to discipline for attorney's false and inflammatory accusations in pleadings filed with the court against judges, attorneys, court staff, and others).

In Hawver's case, discipline is being imposed for his statements as failing to satisfy professional standards for competence as outlined in the KRPC. The State possesses a substantial interest in regulating the practice of law within its borders. See *Railroad Trainmen v. Virginia Bar*, 377 U.S. 1, 6, 84 S. Ct. 1113, 12 L. Ed. 2d 89 (1964); *Sperry v. Florida*, 373 U.S. 379, 383, 83 U.S. 1322, 10 L. Ed. 2d 428 (1963). "Disciplinary proceedings are for the protection and benefit of the public at large." *State v. Callahan*, 232 Kan. 136, 142, 652 P.2d 708 (1982).

The KRPC safeguards the public's confidence that licensed attorneys are "fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the court." See Rule 202 (2013 Kan. Ct. R. Annot. 296). Attorney competence directly affects the fairness of our criminal proceedings. See *Strickland v. Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Hawver's misconduct in violation of KRPC 1.1, therefore, may properly be seen as a significant State interest, and restriction of his personal First Amendment rights by imposing attorney discipline would be appropriate.

*Hawver's Sixth Amendment Challenge*

Hawver next contends disciplining him for his conduct in representing Cheatham would infringe upon Cheatham's Sixth Amendment rights because it would deprive

Cheatham of the right to counsel of his choice and interfere with Cheatham's defense. This argument is without merit because a lawyer cannot raise a client's Sixth Amendment rights as a defense in a disciplinary proceeding.

"[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *United States v. Chronic*, 466 U.S. 648, 658, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Government intrusion into the attorney-client relationship does not violate the Sixth Amendment guarantee unless "the intrusion substantially prejudices the defendant." *United States v. Irwin*, 612 F.2d 1182, 1186-87 (9th Cir. 1980); see also *Mickens v. Taylor*, 535 U.S. 162, 168, 122 S. Ct. 1237, 152 L. Ed. 2d 291, *reh. denied* 535 U.S. 1074 (2002) (defendant must demonstrate at least adverse effect on representation to obtain reversal based on lawyer's conflict of interest, except in limited circumstances of attorney's representation of codefendants); *Strickland*, 466 U.S. at 692 (prejudice required for violation of right to effective assistance of counsel based on deficient attorney performance).

Notably, Hawver makes no allegation that his disciplinary action will or is likely to prejudice Cheatham, nor do we perceive such a threat is possible. See *Partington v. Gedan*, 961 F.2d 852 (9th Cir. 1992) (holding Sixth Amendment did not permit attorney to withhold privileged client communications from attorney discipline investigators). In fact, the contrary is true in this instance because it was Hawver's ethical misconduct that created the violation of Cheatham's Sixth Amendment right to the effective assistance of counsel. See *State v. Cheatham*, 296 Kan. 417, 292 P.3d 318 (2013) (reversing convictions and remanding for new trial due to ineffective assistance of counsel).

A criminal defendant's choice of counsel is properly constrained by regulations governing the practice of law. In other words, the right to counsel of one's choosing is not unlimited. See *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006) ("[A]n element of [the right to assistance of counsel] is the right of a defendant who does not require appointed counsel to choose who will represent him."); *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988) ("[A] defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant."). For example, the choice is limited to counsel who is admitted to practice law. *Wheat*, 486 U.S. at 159. And even during a pending criminal proceeding, ethical violations may override a defendant's choice and permit counsel's disqualification. See *United States v. Nolen*, 472 F.3d 362, 375-76 (5th Cir. 2006) (reversing district court's revocation of out-of-state defense counsel's pro hac vice admission because court failed to balance defendant's Sixth Amendment rights against interests underlying ethics rules violated by defense counsel); *United States v. Collins*, 920 F.2d 619, 627 (10th Cir. 1990).

The Sixth Amendment does not prohibit discipline in this case. Hawver's failure to comply with the KRPC is not excused simply because Cheatham asked Hawver to represent him in a criminal matter. As presiding officer Ridenour explained in his concurring opinion in this case:

> "Under the provisions of KRPC 1.1 (Competence) and 1.16 (Declining or Terminating Representation), I have a professional duty to my client to decline to represent him on legal issues on which I am unqualified; correspondingly, I also have the unstated but universally understood duty to recognize those legal issues on which I am unqualified to represent my client."

Hawver's ethical duties were no less. Cheatham's decision to have Hawver represent him does not insulate Hawver from discipline resulting from the course of that representation; nor is discipline an infringement on Cheatham's Sixth Amendment rights.

*Hawver's challenges to the panel's KRPC 1.1 conclusions*

Hawver appears to raise three additional arguments to attack the panel's conclusion that he violated KRPC 1.1 (competence): (1) He is shielded from discipline because Cheatham approved his strategy decisions; (2) He was free to make judgments about whether to pursue investigations; and (3) ABA guidelines on the performance of death penalty defense counsel cannot be used as conclusive measures of attorney competence. We consider each argument in turn and hold each to be without merit.

*A lawyer must undertake a client's objectives competently*

Hawver argues discipline is inappropriate because he was merely carrying out the defense strategy Cheatham directed. According to Hawver, the defense theory Cheatham approved was:

> "Because Cheatham was an experienced and highly street smart and intelligent criminal, who dealt cocaine for a living, and had already been convicted of killing another dope dealer who pulled a gun during a dope deal, if he had murdered the two women, he would not have left an eye witness alive to identify him."

To support his argument, Hawver attaches a one-page, handwritten document purporting to be directions from Cheatham regarding the case. Hawver includes this document as an appendix to his brief to this court, but it was not introduced at the panel hearing and is not in the record. So in addition to objecting to Hawver producing the

document now, the Disciplinary Administrator also argues the document is silent on much of Hawver's misconduct, such as his lack of knowledge and experience necessary to defend a death penalty case, failure to accept BIDS assistance or to investigate the facts of the case, inadequate jury selection technique, and inadequate mitigation case. The Disciplinary Administrator further argues Hawver cannot hide behind Cheatham's strategy choices because Hawver failed to adequately investigate the case and explain all potential problems with the chosen courses of action. The Disciplinary Administrator is correct on all points.

The document attached to Hawver's brief is not properly before this court because it is not part of the record. Rule 6.02(b) (2013 Kan. Ct. R. Annot. 39). "Material which is annexed to an appellate brief by way of an appendix . . . cannot be considered on appeal." See also *In re Gershater*, 270 Kan. 620, 633, 17 P.3d 929 (2001) (declining to consider exhibits to lawyer's brief because exhibits not part of record from disciplinary proceedings). Accordingly, we have not considered the letter, although this is of little substantive effect because Hawver's testimony to the panel contains frequent references to what Hawver described as Cheatham's consent to the defense strategy and we have taken that testimony into account. But Hawver cannot avoid discipline even if Cheatham approved the defense theory and strategy pursued at trial.

In a criminal case, a defendant has a right to decide specific aspects of the case, *i.e.*, what plea to enter, whether to waive a jury trial, and whether to testify. *Flynn v. State*, 281 Kan. 1154, 1163, 136 P.3d 909 (2006). Beyond these matters, "defense counsel is responsible for strategical and tactical decisions like preparation, scheduling, and the type of defense." *Flynn*, 281 Kan. at 1163 (citing *State v. Rivera*, 277 Kan. 109, 117, 83 P.3d 169 [2004]); KRPC 1.2, comment 1 (2013 Kan. Ct. R. Annot. 460) ("[T]he lawyer should assume responsibility for technical and legal tactical issues, but should defer to the client regarding such questions as the expense to be incurred and concern for

third persons who might be adversely affected."). In carrying out his responsibility, Hawver was duty-bound to perform "inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners," as well as explaining the "matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." KRPC 1.1, comment 5 (2013 Kan. Ct. R. Annot. 447); KRPC 1.4(b) (2013 Kan. Ct. R. Annot. 484).

Hawver was required to conduct himself in conformity with the KRPC both in counseling Cheatham on the decisions within Cheatham's purview and in implementing them once they were made. But even so, Hawver's "consent to strategy" argument against these ethical charges does not account for his failure to obtain training to defend a capital murder case, failure to track Cheatham's cell phone to determine its location at the time of the murders, failure to file the statutorily required notice of alibi, failure to death-qualify and life-qualify the jury, failure to challenge the death penalty's constitutionality in light of then-existing caselaw, failure to present more than one mitigator in the case's penalty phase, and closing argument during which Hawver told the jury it ought to execute the killer.

Cheatham's approval of Hawver's general theory of defense—assuming it was given—would not immunize Hawver from responsibility for his KRPC violations in the course of this representation.

*Decisions about pretrial investigations must be informed*

Hawver next argues he cannot be disciplined for his investigative shortcomings because "counsel must be free to make judgments about whether or not to pursue investigations." He argues:

39

"Disregarding their duty to base disciplinary recommendations on clear and substantial evidence, and without any evidence or testimony from Cheatham (which certainly cannot be disclosed where Cheatham is being retried), the tribunal has invented injuries to Cheatham including the failure to track down the alleged alibi witnesses and the failure to provide the state ample opportunity to probe Cheatham's psyche and otherwise explore substantiations to overcome his plea of innocence. This conduct by the panel is an invitation for this court to violate the law as it has been clearly established by our nation's highest court . . . ."

While counsel is free to make strategy decisions, including those concerning case investigation, that discretion is not unfettered. Such decisions are constrained by the attorney's obligation to conduct the investigation reasonably necessary for the representation. KRPC 1.1, comment 5 (2013 Kan. Ct. R. Annot. 447) states:

"Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standard of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequence."

An attorney's decisions regarding the scope of pretrial investigation and preparation must be informed. See *In re Samad*, 51 A.3d 486, 495-96, 501 (D.C. 2012) (imposing discipline on attorney who made uninformed decision to forgo pretrial investigation and preparation, and instead intended to rely on defense formulated based on review of file and general discussions with client); see also *Flynn*, 281 Kan. at 1157 (under standard for measuring effective assistance of counsel, strategic choices based on thorough investigation "virtually unchallengeable," and those based on less than complete

investigation reasonable only to extent "reasonable professional judgment" supports limitation on investigation).

Hawver's investigative efforts failed to meet the standard of competence. Based on his affidavit and testimony at the disciplinary hearing, the panel found Hawver spent approximately 60 hours preparing for Cheatham's trial, failed to investigate a potential alibi witness, failed to interview witnesses, and failed to conduct any penalty-phase investigation. The evidence established these were not reasoned strategic decisions. The limited time Hawver spent preparing the case was due to his political activities and need to attend to profit-generating legal matters for other clients. His failure to investigate for the guilt phase of Cheatham's case was based on lack of funds, despite having been offered financial assistance from the Board of Indigents' Defense Services. The extent of his investigation into potential alibi witnesses Cheatham had identified was a phone call to Cheatham's mother and reviewing an unspecified police report.

In addition, Hawver was unaware he could subpoena out-of-state witnesses and that cell phone locations might be tracked. And he did not investigate at all for the penalty phase of his client's capital murder case because he was unfamiliar with the substantive and procedural law governing the death penalty, "banked" on winning acquittal for Cheatham, and failed to familiarize himself with standard practices employed in death penalty cases, such as those described in the ABA guidelines. Finally, Hawver's suggestion that Cheatham's testimony was necessary during the disciplinary proceeding to prove injury is meritless because injury to the client is not an element of KRPC 1.1 or any other KRPC violations the panel found.

Hawver's investigative failings were not based on reasonable professional judgment. The panel properly concluded that Hawver violated KRPC 1.1 in this regard.

41

*The panel's conclusions were not based solely on ABA guidelines*

Hawver next argues the panel erred when it considered the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, asserting that "an attorney cannot be restrained by ABA guidelines and that the particular form of unlawful state interference with the conduct of a criminal defense by imposing standards *threatens* the fundamental liberty and Due Process rights of a defendant." We construe this as a claim that the panel erred by finding misconduct solely based on a failure to conform to ABA guidelines. This argument is without merit.

The guidelines do not establish mandatory standards for attorney conduct. *Cheatham*, 296 Kan. at 433. But Hawver's argument is factually wrong because the panel did not conclude Hawver committed misconduct by failing to conform to the guidelines.

Instead, it considered that fact along with Hawver's other conduct in ultimately concluding Hawver did not competently represent Cheatham. The panel's findings that Hawver lacked the experience necessary to litigate a death penalty case; failed to devote sufficient time to overcome that deficiency and adequately prepare for the case; failed to conduct a sufficiently thorough fact investigation for either phase of Cheatham's trial; and presented damaging arguments are amply supported by the record—most notably by Hawver's own affidavit. The ABA guidelines were merely one touchstone with which the panel assessed the facts before it.

In the end, with or without the ABA guidelines, the panel was led by the totality of evidence to the virtually inescapable conclusion that Hawver violated KRPC 1.1.

*Hawver's Fee Agreement*

Hawver argues the panel erred when it

"adopted this court's finding 'that respondent's flat fee arrangement, under the facts of this case, resulted in a conflict of interest as it 'provided a financial disincentive for respondent to actively investigate or promote Cheatham's defense' and respondent's 'personal and business interests were contrary to Cheatham's and that conflict adversely affected respondent's representation of Cheatham.'""

He contends the panel assumed this finding

"without a hearing and testimony providing clear and convincing proof of the same . . . which would also include factual evidence on whether the requirements imposed by the Kansas Supreme Court in the [*Cheatham*] decision would have the real and practical effect of violating the clearly established Sixth Amendment rights of indigent defendants to plead guilty and to choose a defense attorney not approved or controlled by the state . . . ."

The panel's record dispels any merit to this contention. The panel conducted a hearing and received evidence on this issue, including Hawver's testimony. Its conclusion that Hawver violated KRPC 1.7 is supported by clear and convincing evidence.

"[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a substantial risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer." KRPC 1.7(a)(2) (2013 Kan. Ct. R. Annot. 517). "[A] conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." KRPC 1.7, comment 8 (2013 Kan. Ct. R.

43

Annot. 518). The phrase "other responsibilities or interests" in that rule includes the lawyer's business and financial interests. See *In re Davidson*, 285 Kan. 798, 803, 175 P.3d 855 (2008) (KRPC 1.7 violated when lawyer from whom client sought advice on a business lease dispute obtained a financial interest in client's business).

The record before us in Hawver's disciplinary case similarly leads us to conclude the fee agreement created a conflict of interest in violation of KRPC 1.7. Hawver testified that he "didn't think there was much chance if [he] lost [Cheatham's] case that [he] was going to be paid" and that he in fact received no money for his work. He said he maintained his legal practice during his representation of Cheatham because he needed the fees to earn a living and Cheatham knew he was "putting in the amount of time [he] could on this thing . . . ."

The combination of the flat-fee agreement, Cheatham's inability to pay, and Hawver's need to devote his time to fee-generating matters supports the panel's conclusion that Hawver's personal interests created a conflict of interest, causing him to materially limit Cheatham's representation. Hawver had a financial disincentive under the circumstances to devote the necessary time and resources to Cheatham's case.

Manifestations of this risk are found in the approximately 60 pretrial hours Hawver spent preparing for the case and, when coupled with his knowledge he was unlikely to be paid if Cheatham was convicted, Hawver's admitted failure "to prepare any case in the event [the jury found Cheatham] guilty." In short, there was clear and convincing evidence to support the panel's conclusion Hawver violated KRPC 1.7.

*Hawver's failure to answer the complaint*

Hawver claims he answered the Disciplinary Administrator's formal complaint. The record demonstrates otherwise.

In January 2013, the Disciplinary Administrator notified Hawver by letter that it had docketed a complaint against him. See Rule 209 (2013 Kan. Ct. R. Annot. 355) (complaints to be filed with Disciplinary Administrator, who must docket all complaints not determined frivolous or meritless). Hawver responded to this docketing notice by letter, dated March 2, 2013. In June 2013, the Disciplinary Administrator advised Hawver that a review committee had found probable cause to believe he violated the KRPC and a formal complaint would be filed. See Rule 210(c) (2013 Kan. Ct. R. Annot. 356) (after investigation, Disciplinary Administrator to recommend action on complaint to review committee). The Disciplinary Administrator filed that formal complaint on August 20, 2013, and advised Hawver of his obligation to file an answer. Hawver did not respond.

The Disciplinary Administrator then filed a supplemental complaint on October 8, 2013, alleging a violation of Rule 211(b), which requires an attorney against whom a formal complaint is filed to answer the complaint within 20 days. Hawver responded to that supplemental complaint with a document titled "Second Answer to Formal Complaint and Answer to the Supplement to Formal Complaint," in which he alleged he actually answered the original August 20 formal complaint with his earlier March 2 letter.

Hawver continues on that same claim in this court, contending the panel erred when it concluded he violated Rule 211(b) by failing to answer the formal complaint. He contends he "answered the original formal complaint in written answer dated March [2], 2013, and hand delivered to [the] Disciplinary Administrator . . . ." He further asserts punishing him for failing to answer the complaint is a pretext to retaliate against him for

45

exercising his First Amendment rights. Hawver's contention that he timely answered the formal complaint is without merit.

The March 2 letter does not constitute a response to the formal complaint because it was written and delivered to respond only to the notice. The formal complaint consisted of separately numbered paragraphs to which Hawver was required under our rules to address directly. The specifics in the formal complaint were not detailed prior to Hawver's March 2 letter, so it obviously could not constitute an answer to the formal complaint. The panel's findings regarding the Rule 211(b) violation are supported by clear and convincing evidence.

APPROPRIATE DISCIPLINE

Hawver does not advance any argument as to what discipline should be imposed. At the disciplinary hearing, he requested that he should simply be restricted from taking any more murder cases. The Disciplinary Administrator argued disbarment was appropriate because Hawver intentionally violated his duties in the *Cheatham* case and had previously entered into a diversion agreement for another prior violation of KRPC 1.1 (competence) during the time he was representing Cheatham.

The panel unanimously found Hawver intentionally violated duties owed to his client and to the legal system. It also found Hawver's conduct "caused actual injury to the administration of justice" because it necessitated Cheatham's retrial. And it was unanimous in its determination that several aggravating and mitigating factors existed.

The panel determined the aggravating factors were: (1) Hawver entered a diversion agreement for a prior disciplinary offense (a violation of KRPC 1.1 for which Hawver entered a diversion agreement); (2) Hawver engaged in a pattern of misconduct

46

because he engaged in misconduct throughout his representation of Cheatham; (3) Hawver engaged in multiple offenses; and (4) at the time of misconduct, Hawver had substantial experience in the practice of law. The mitigating factors the panel found were: (1) Hawver's conduct was not motivated by dishonesty or selfishness; and (2) Hawver acknowledging his misconduct. In his brief, Hawver does not challenge the panel's aggravating and mitigating findings.

In addition to the injury to the legal system found by the panel, it is important to note Hawver's misconduct actually injured Cheatham, who was "improperly advised by [an] unqualified lawyer[ ]" resulting in a deprivation of Cheatham's constitutional right to assistance of counsel. See *In re Phillips*, 226 Ariz. 112, 114-15, 118, 244 P.3d 549 (2010) (supervising attorney, among other things, allowed employee attorneys,  and nonattorneys, not familiar with practice areas at issue to "close" retainer agreements with clients and advise clients on prospects of success). Moreover, Hawver's inadequate performance—particularly as to the penalty phase of Cheatham's trial—might have caused or contributed to the jury sentencing Cheatham to death.

In deciding that disbarment is the appropriate sanction under the circumstances, this court is mindful that one panel member recommended indefinite suspension, while the remaining two recommended disbarment. We also recognize there may be some tension in reconciling the panel's conflict of interest findings with its determination of a lack of selfishness as a mitigating factor.

But in this court's view the essentially uncontroverted findings and conclusions regarding Hawver's previous disciplinary history, his refusal to accept publicly financed resources to aid in his client's defense, and his inexplicable incompetence in handling Cheatham's case in the guilt and penalty phases of the trial are more than sufficient to require disbarment. See ABA Standard 4.51 (disbarment generally appropriate when a

lawyer's course of conduct demonstrates "the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client"). We hold that disbarment is the appropriate discipline.

CONCLUSION

IT IS THEREFORE ORDERED that Ira Dennis Hawver be disbarred in accordance with Supreme Court Rule 203(a)(1) (2013 Kan. Ct. R. Annot. 300).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2013 Kan. Ct. R. Annot. 406).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

LUCKERT, J., not participating.
HILL, J., assigned.[1]
MICHAEL J. MALONE, Senior Judge, assigned.[2]

---

[1] **REPORTER'S NOTE:** Judge Hill, of the Kansas Court of Appeals, was appointed to hear case No. 111,425 vice Justice Luckert pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c).

[2] **REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 111,425 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.