IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,337

In the Matter of DARREN E. FULCHER,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held May 10, 2024. Opinion filed July 26, 2024. Two-year suspension stayed, conditioned upon successful participation and completion of two-year probation period.

*Kate Duncan Butler*, Deputy Disciplinary Administrator, argued the cause, and *Amanda G. Voth,* Deputy Disciplinary Administrator, was on the formal complaint for the petitioner.

*M. Todd Moulder*, of Morrow Willnauer Church, LLC, argued the cause for the respondent, and *Darren E. Fulcher,* respondent*,* argued the cause pro se.

PER CURIAM:  This is an original proceeding in attorney discipline filed by the Office of the Disciplinary Administrator (ODA) against the respondent, Darren E. Fulcher, an attorney admitted to the practice of law in Kansas in 1999. The following summarizes the history of this case before the court.

After the ODA filed a formal complaint against respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC), Fulcher timely responded. In due course, respondent filed a proposed probation plan. An appointed panel held a formal hearing on the complaint, during which respondent personally appeared. The hearing panel determined the respondent violated KRPC 1.8 (conflict of interest:  current clients: specific rules) (2024 Kan. S. Ct. R. at 347) and KRPC 1.15 (safekeeping property) (2024 Kan. S. Ct. R. at 369).

1

More specifically, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

"11.     The hearing panel finds the following facts, by clear and convincing evidence:

"12.     On November 22, 2022, the Supreme Court of Missouri entered an order indefinitely suspending the respondent from the practice of law in Missouri, with no leave to apply for reinstatement for two years. The Missouri Supreme Court found that the respondent violated Missouri Rules of Professional Conduct 4-1.8(e) and 4-1.15(a), (d), and (f).

"13.     The respondent's license to practice law in Missouri remains suspended as of the date of this Final Hearing Report.

"14.     The United States District Court for the District of Kansas adopted the discipline imposed by the Missouri Supreme Court, suspending the respondent indefinitely with no leave to apply for reinstatement for two years.

"15.     The Missouri Supreme Court based its ruling on the record before the Missouri Disciplinary Hearing Panel and briefs and argument by the parties. The Disciplinary Hearing Panel issued its decision on June 6, 2022.

"16.     Before the Missouri Disciplinary Hearing Panel, Kelly Dillon, an investigator and financial examiner with the Missouri Office of Chief Disciplinary Counsel ('OCDC'), testified about an audit she performed of the respondent's trust account based on a complaint received by the OCDC.

"17.     The respondent handled primarily personal injury cases and some criminal defense cases. Most of the personal injury cases were handled on a contingent fee basis. During the Missouri disciplinary hearing, the respondent admitted that the trust accounting system he set up was not sufficient, he thought he had all of the numbers in his head, and he was not reconciling the trust account as he should have been.

"18.     Ms. Dillon audited the respondent's trust account for the timeframe December 4, 2017, through September 17, 2020. Ms. Dillon subpoenaed the respondent's bank records and also asked the respondent for certain client records so that she could compare them to the bank transactions.

"19.     Ms. Dillon's audit revealed, as stipulated by the parties in this matter, that in some instances, the respondent's clients were not promptly and initially completely paid, and in other instances, third parties were not promptly and initially completely paid.

"20.     The parties also stipulated in this matter, that after Ms. Dillon discovered, through her audit that some clients and third parties had not been promptly and completely paid, the respondent made the clients and third parties financially complete by paying them what the audit showed they were owed.

"21.     Ms. Dillon's audit revealed issues with the respondent's accounting and disbursements from the trust account in the clients' cases discussed below. In all of the below cases, the respondent received settlement funds on his clients' behalf and deposited those funds into his trust account. Generally, after receiving the settlement funds, the respondent would draft settlement statements, asking his clients to sign the statements to show they reviewed them. In the settlement statement, the respondent listed the amount of settlement funds received, which exceeded the sum of the liens and other payments listed in each case. The listed payments to come out of the settlement generally included payment to the client, attorney fees, case expenses, and any medical or other liens paid on the client's behalf.

"22.     In P.R.'s September 2019 settlement, the respondent issued a settlement statement to P.R. showing $1,292.43 was owed to Coliseum Imaging Center, $499.72 in

3

case expenses, and $19,000.00 for the respondent's attorney fee. However, the respondent did not make the transfers shown on this settlement statement. In fact, the Coliseum Imaging Center was not owed, because P.R.'s insurance ultimately paid this bill in full. The respondent issued a check to P.R. for the remaining $1,292.43 after the OCDC audit revealed this discrepancy.

"23.    In T.S.'s January 2018 settlement, two of the medical lienholders agreed to accept amounts lower than their bills to settle the liens. However, the settlement statement provided to T.S. did not reflect the lower amounts for these liens. After the OCDC requested documentation of the two payments in 2020, the respondent paid one lien provider an additional $200.00 to pay that provider's bill in full, and paid T.S. the $283.16 difference in the other provider's bill.

"24.    In F.G.'s April 2018 settlement, the settlement statement reflected a medical lien to Midwest Radiology Consultants for $181.00, however this payment was not made. After the OCDC requested proof of this payment in 2020, the respondent said he did not know how this payment was missed and afterward made the outstanding payment to the provider.

"25.    In H.A.'s April 2018 settlement, the respondent received $28,000.00 in settlement funds. Before the respondent disbursed money to his client or the lienholder, the respondent's trust account balance fell to $12,148.06. Over six months later, the respondent distributed $11,623.08 to H.A. Over two months after that, the respondent distributed $3,995.94 to the lienholder.

"26.    In G.I.'s April 2018 settlement, the respondent did not pay his client her recovery of $178.32, nor did he pay $237.84 to a medical group. When the OCDC asked the respondent about these two payments in 2020, the respondent said that his client did not ever come to pick up her check. Several months later, the respondent issued payment to his client and the medical group.

"27.    In B.R-R.'s June 2018 settlement, the respondent listed a medical lien of $325.00 on the settlement statement. However, this amount was paid by insurance.

4

Several months after the OCDC asked the respondent about this payment, the respondent issued . . . B.R-R. a payment for $325.00.

"28.    In V.W.'s June 2018 settlement, the respondent paid a medical lienholder $1,890.34 instead of $1,906.90 it was due. When asked by the OCDC about the discrepancy in 2020, the respondent was unsure of the reason and paid the lienholder the $16.56 difference several months later.

"29.    In R.S.'s July 2018 settlement, the settlement statement listed liens of $820.00 to Dr. Zimmerman and $139.05 to Interpreters Inc. The respondent did not pay these on receipt of the settlement funds for R.S.'s case, however, the respondent did pay half of the Interpreters Inc. bill prior to receiving the settlement funds. After the OCDC inquired about these two bills in 2020, the respondent made payment to Dr. Zimmerman and issued a check to his client for the $69.52 difference between the Interpreters Inc. bill and the payment he had previously made.

"30.    In D.A.'s July 2018 settlement, the respondent issued a settlement statement showing a client recovery of $3,435.61 but issued a check to D.A. for only $3,035.61. When the OCDC asked the respondent about the $400.00 difference in 2020, the respondent did not know if the client asked for the $400.00 difference in cash or whether he paid for his traffic fines. The respondent advised that the client did not know either. Several months later, the respondent paid D.A. the $400.00 difference.

"31.    In M.E.'s October 2018 settlement, the settlement statement showed a medical lien to Camren Health for $5,665.00, but the respondent paid Camren Health only $4,365.00. When the OCDC inquired about this payment in 2020, the respondent said he was waiting on confirmation of payment from the lienholder. Then, several months later, the respondent paid Camren Health $1,200.00 and paid M.E. the remaining $100.00.

"32.    In G.B.'s late 2018 settlement, the respondent paid G.B. $1,427.32 from his trust account before depositing any funds into that account for the benefit of G.B. The

5

check to G.B. was drawn against other clients' funds. The next day, settlement funds of $4,566.60 were deposited for the benefit of G.B.

"33.    In C.D.'s January 2019 settlement, on March 26, 2019, the respondent's trust account balance fell to $5,603.69, below the $8,372.60 still owed to two lienholders in C.D.'s case. Those liens were paid three months later.

"34.    In J.J.'s June 2019 settlement, the respondent deposited $100,000.00 in settlement funds, but his overall trust account balance fell to $40,000.00 before he made payment to J.J. and two lienholders. At the time the respondent's trust account balance fell to $40,000.00, the respondent owed J.J. $58,976.02 and owed the lienholders $1,100.00 and $950.00. The respondent eventually paid J.J. and the lienholders around one year later.

"35.    In N.N.'s July 2019 settlement, the settlement statement reflected that N.N.'s client recovery was $1,783.59. However, the respondent paid N.N. only $1,283.59. When the OCDC asked the respondent about the $500.00 difference, the respondent stated that he had advanced $500.00 of the settlement to his client out of his operating account a few days before receiving the settlement funds because N.N. was in a financial crisis. The respondent knew he was not to advance fees to clients.

"36.    In S.B.'s June 2019 settlement, the settlement statement showed a lien to Dr. McAllister for $375.00. When the OCDC asked the respondent for proof that this lien was paid, the respondent was unable to find a paid invoice. Several days after the OCDC's June 2020 inquiry, the respondent paid Dr. McAllister $375.00.

"37.    In C.G.'s July 2019 settlement, the settlement statement reflected a lien to Optum for $11,049.29, but the respondent paid Optum only $10,000.00. After the OCDC asked the respondent about the $1,049.29 difference in June 2020, the respondent gave varying reasons for the difference between the two amounts. A month after the OCDC's inquiry, the respondent paid C.G. $1,049.29.

6

"38.    In A.Br.'s November 2019 settlement, the OCDC asked the respondent about a medical lien shown on the settlement statement for $4,258.34. A little over a month after the OCDC's June 2020 inquiry, the respondent paid the lien.

"39.    In G.S.'s November 2019 settlement, the OCDC asked the respondent in June 2020 about a medical lien of $387.92 on the settlement statement. The respondent initially responded to the OCDC that he thought this lien had been paid, but subsequently paid the lien approximately one month later.

"40.    In D.M.'s December 2019 settlement, the settlement statement showed a lien for $1,585.23, but the respondent paid $1,541.28. When the OCDC inquired about the $43.95 difference in June 2020, the respondent stated he did not know why there was a discrepancy. A little over one month later, the respondent paid the remaining $43.95 of the lien.

"41.    In T.B.'s November 2019 settlement, the settlement statement showed a payment to T.B. of $4,263.89, but the respondent paid T.B. $4,236.89. When OCDC asked about the discrepancy, the respondent said that the numbers were transposed and paid T.B. the $27.00 difference.

"42.    In A.Bo.'s January 2020 settlement, the settlement statement reflected a medical lien of $3,168.64. When the OCDC requested proof of payment of this lien from the respondent in June 2020, he stated that he paid this lien from his operating account and then reimbursed from the settlement funds in the trust account. The OCDC audit did not reflect a corresponding withdrawal from the trust account. The proof of payment ultimately provided by the respondent showed a cash payment on June 12, 2020, which was after the OCDC's inquiry about the discrepancy.

"43.    In T.S.'s January 2020 settlement, the respondent paid T.S. $3,288.37 and kept the remainder of the settlement funds in his trust account. The settlement statement reflected that part of the settlement funds were used to pay attorney fees in criminal cases in which the respondent represented T.S. The evidence in the Missouri disciplinary matter showed that money the respondent had already earned was held in his

7

trust account. The respondent testified at the Missouri hearing that h[e] withdrew the money when he thought he earned it. The Missouri audit showed that the respondent's withdrawals from his trust account were not based on any type of accounting or calculation of earned fees.

"44.    In E.H.'s February 2020 settlement, the settlement statement showed a lien of $4,416.50 to Dr. Porter and of $131.00 to Midwest Radiology Consultants. The respondent did not pay these liens. The respondent told the OCDC that he did not pay Dr. Porter because his client asked him not to because he felt he was overcharged. The respondent testified that, after the complaint with the OCDC, the respondent's client gave him permission to pay Dr. Porter. The respondent stated he did not know why the $131.00 lien was not paid. The respondent paid both liens after the OCDC's June 2020 inquiry about the absence of payments.

"45.    On October 23, 2018, $12,500.00 was deposited into the respondent's trust account with a memo 'Kenneth Jones.' According to the respondent, this deposit included attorney fees that were already earned. The respondent left these earned funds in his trust account.

"46.    On October 26, 2018, there was a deposit of $13,711.34 from AT&T into the respondent's trust account. The respondent told the OCDC that he was unaware of what matter the AT&T payment was associated with but suspected it was associated with attorney fees and expenses on a case where he served as co-counsel.

"47.    The respondent was the only authorized signer on the bank accounts and failed to keep accurate trust account records.

"48.    During the time range of the OCDC audit, December 2017 through September 2020, the respondent frequently failed to pay clients and third parties funds that he held in his trust account on their behalf. During this time, the respondent routinely failed to withdraw earned attorney fees from his trust account.

8

"49. Further, from December 2017 through September 2020, the respondent frequently made withdrawals from his trust account in amounts as high as $90,000.00. From June 19, 2020, to September 1, 2020, the respondent made five cash withdrawals in amounts as high as $5,000.00. The respondent paid himself in large, round transfer amounts and not based on exact attorney fees earned.

"50. Further, the OCDC audit revealed that at times the respondent's trust account balance fell short when compared with known outstanding undisbursed amounts belonging to clients and third parties. On May 9, 2018, the respondent's trust account was over $4,000.00 short. On March 26, 2019, the account was over $6,700.00 short. On September 10, 2019, the account was over $29,000.00 short. On February 26, 2020, the account was over $60,000.00 short.

"51. The following clients' cases had undisbursed money when the trust account balance was short, owed either to clients or to third parties: P.R., T.S., F.G., G.I., B[.]R-R., V.W., R.S., D.A., M.E., D.D., J.J., S.B., C.G., A.Br., G.S., D.M., T.B., A.Bo., T.S., and E.H.

"52. In September 2020, the respondent opened a new trust account and hired an accounting firm to provide him with monthly reconciliations.

"53. The accounting firm hired by the respondent employs Tim Eaton, who testified during the formal hearing in this matter. Mr. Eaton is a bookkeeper and performs bookkeeping and tax services for the respondent's firm. Mr. Eaton reconciles the respondent's firm accounts, including his Kansas trust account, once per month.

"54. Mr. Eaton does not review any original documentation or client settlement statements as part of the bank account reconciliations he performs for the respondent. Mr. Eaton compares the information the respondent enters into QuickBooks to the respondent's bank account statements when performing reconciliations. Mr. Eaton's accounting firm does not perform audits of the respondent's account and does not verify that the respondent's clients or third parties are paid the amounts they are entitled to in a given case.

"55.    The respondent had issues with his trust account on at least two prior occasions. The Missouri Disciplinary Hearing Panel found that in 2010, the respondent received a letter of caution relating to an overdraft of his attorney trust account. The letter of caution suggested the respondent attend a CLE entitled 'Fundamentals of Trust Accounting' and instructed him to notify the OCDC once he had completed the CLE. Two follow up letters were sent.

"56.    In 2011, the respondent was issued an admonition for violation of Missouri Rule 4-1.15, for his trust account going into overdraft, not depositing advanced fees into his trust account, not reconciling monthly, and not keeping current and accurate client ledgers. The admonition again suggested the respondent attend the trust accounting CLE. The respondent never attended the CLE.

"*Conclusions of Law*

"57.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.8(e) (conflict of interest:  current clients: specific rules), and 1.15(a) and (b) (safekeeping property), as detailed below.

"58.    Had the parties not stipulated to violation of the KRPC, the hearing panel would look to Kansas Supreme Court Rule 221(c), which states that:

'Reciprocal Discipline. When the licensing authority of another jurisdiction disciplines an attorney for a violation of the rules governing the legal profession in that jurisdiction, for the purpose of a disciplinary board proceeding under these rules, the following provisions apply.

. . . .

'(2) If the determination of the violation was based on less than clear and convincing evidence, the determination is prima facie evidence of the commission of the conduct that formed the basis of the violation and raises a

10

rebuttable presumption of the validity of the finding of misconduct. The respondent has the burden to disprove the finding in a disciplinary proceeding.'

"59.    The burden of proof in a Missouri attorney discipline proceeding is preponderance of the evidence. Missouri Supreme Court Rule 1.15(g). The Missouri Supreme Court found that the respondent violated Missouri Rules of Professional Conduct 4-1.8(e), 4-1.15(a), (d), and (f) under the preponderance of the evidence standard. Because the Missouri Supreme Court's finding was based on less than clear and convincing evidence, its finding is prima facie evidence of the commission of the conduct that formed the basis of the violation and raised a rebuttable presumption of the validity of the finding of misconduct. The respondent had the burden to disprove the finding in this disciplinary proceeding.

"60.    However, the respondent elected not to rebut this presumption. Instead, the respondent stipulated that his conduct violated KRPC 1.8(e), 1.15(a), and 1.15(b).

"61.    As a result, the hearing panel will not apply Rule 221(c) to reach its recommendation and instead relies on the evidence presented, the parties' factual stipulations, and the stipulation that the respondent's conduct violated KRPC 1.8(e), 1.15(a), and 1.15(b).

"KRPC 1.8

"62.    KRPC 1.8(e) provides:

'(e)    A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1)    a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

(2)    a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.'

11

"63.     The respondent provided financial assistance to his client N.N.in the amount of $500.00. The circumstances under which the respondent provided financial assistance did not fit within either exception in KRPC 1.8(e)(1) or (2).

"64.     The respondent stipulated that he violated KRPC 1.8(e).

"65.     Accordingly, the hearing panel concludes that the respondent violated KRPC 1.8(e).

"KRPC 1.15(a)

"66.     Lawyers must properly safeguard their clients' property. KRPC 1.15(a) specifically provides:

'(a)     A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.'

"67.     The respondent routinely failed to keep funds belonging to his clients and third-party lienholders separate from his own property in his trust account. The evidence shows that the respondent regularly failed to properly account for attorney fees, client funds, third party funds, and expenses held in his trust account. The respondent paid funds to his firm from the trust account without properly accounting that the amount withdrawn was the correct amount of earned attorney fees. This is evidenced, in part, from the fact that the respondent would routinely withdraw whole round numbered amounts as his attorney fees, even though settlement calculations did not include whole round numbered amounts; the respondent's delay in paying clients and third parties

12

amounts belonging to them; and the fact that the respondent's trust account balance dropped below the amount of outstanding disbursements owed to others.

"68.     The respondent stipulated that he violated KRPC 1.15(a).

"69.     Accordingly, the hearing panel concludes the respondent violated KRPC 1.15(a).

"KRPC 1.15(b)

"70.     Lawyers must also promptly notify others of receipt of funds and promptly deliver those funds belonging to clients and third persons. KRPC 1.15(b) provides:

'(b)     Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.'

"71.     In the cases discussed above, the respondent failed to promptly deliver funds belonging to clients or third parties, or both. The respondent also failed to promptly notify clients and third parties that he had received funds on their behalf. In most of these cases, the respondent did not deliver payments owed to clients or third parties until the OCDC inquired about missing payments or discrepancies, in some cases many weeks or months later and in at least one case a full year later.

"72.     The respondent stipulated that he violated KRPC 1.15(b).

"73.     Accordingly, the hearing panel concludes that the respondent violated KRPC 1.15(b).

13

"74.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"75.     *Duty Violated*. The respondent violated his duty to his clients and the third parties for whom he held funds.

"76.     *Mental State*. The respondent knowingly violated his duty. Attorneys are obligated to know the professional rules governing their license, including the rules surrounding safekeeping property of others. Further, the respondent previously received a letter of caution and an admonition for his trust account going into overdraft and other improper trust accounting practices from the OCDC.

"77.     *Injury*. As a result of the respondent's misconduct, the respondent caused injury to the clients and third parties who were not promptly paid funds the respondent was obligated to safeguard and promptly deliver to them.

"78.     In addition to the above-cited factors in Standard 3, the hearing panel has thoroughly examined and considered the following Standards:

'4.12     Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

'4.13     Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.'

14

"Aggravating and Mitigating Factors

"79.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"80.     *Prior Disciplinary Offenses*. The respondent has been previously disciplined in Missouri. In 2010 the respondent received a letter of caution and in 2011 received an admonition as discussed above. Both the letter of caution and the admonition were regarding the respondent's improper handling of his trust account. This is an aggravating factor here, where the respondent again mismanaged his trust account.

"81.     *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated 1.8(e) (conflict of interest: current clients: specific rules) and 1.15(a) and (b) (safekeeping property). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"82.     *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1999. The respondent was admitted to the practice of law in Missouri in 1998. At the time of the misconduct, the respondent has been practicing law for around 20 years. The hearing panel concludes that the respondent had substantial experience in the practice of law when the misconduct occurred.

"83.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"84.     *Absence of a Dishonest or Selfish Motive*. The respondent's misconduct does not appear to have been motivated by dishonesty or selfishness. There was no

15

evidence the respondent took funds belonging to others for his own benefit. The evidence indicates that the respondent's misconduct was the result of deficient accounting practices.

"85.     *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations and stipulated that he violated KRPC 1.8(e), 1.15(a), and 1.15(b). The hearing panel concludes that this is a mitigating factor.

"86.     *Remorse.* At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct. The respondent understood that his conduct violated the rules and had a negative impact on his clients and third-party lienholders. The respondent's remorse is also shown by his efforts to improve his accounting practices, including hiring an accounting firm to do his bookkeeping. The hearing panel concludes this is a mitigating factor.

"87.     *Imposition of Other Penalties or Sanctions*. The respondent has experienced other sanctions for his misconduct. The respondent's Missouri license was suspended indefinitely by the Missouri Supreme Court without the ability to apply for reinstatement for two years.

"88.     *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of his community in Kansas City, Missouri. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel. Further, the hearing panel heard testimony from Stan Archie, clinical director of several nonprofits that assist with housing, personal development, and transition to independence in the Kansas City Metro area. Mr. Archie testified that the respondent is a trusted and valued member of the community who volunteers his time and skills to the underserved community and serves as a mentor to

16

young men in the Kansas City Metro area. The hearing panel concludes the respondent's reputation and good character is a mitigating factor.

"*Recommendation of the Parties*

"89.     The disciplinary administrator recommended that the respondent be suspended for a period of two years, with the two-year suspension being retroactive to the respondent's suspension of his Missouri license. Further, the disciplinary administrator recommended that as a condition of his reinstatement to practice law in Kansas, that the respondent show proof of his reinstatement to practice law in Missouri. The disciplinary administrator did not recommend that the respondent be subject to a reinstatement hearing in Kansas under Rule 232.

"90.     The respondent recommended that he receive a published censure, or alternatively, if it is found that the respondent's misconduct was knowing, that he be placed on probation according to the terms of his proposed probation plan.

"*Discussion*

"91.     When a respondent requests probation, the hearing panel is required to consider Rule 227, which provides:

'(d)     Restrictions on Recommendation of Probation. A hearing panel may not recommend that the respondent be placed on probation unless the following requirements are met:

(1)     the respondent complies with subsections (a) and (c) and the proposed probation plan satisfies the requirements in subsection (b);

(2)     the misconduct can be corrected by probation; and

(3)     placing the respondent on probation is in the best interests of the legal profession and the public.'

17

"92.	The respondent developed a workable, substantial, and detailed plan of probation. The respondent provided a copy of the proposed plan of probation to the disciplinary administrator and each member of the hearing panel at least 14 days prior to the hearing on the formal complaint. The misconduct, in this case, can be corrected by probation. The probation plan designates a practice supervisor. Placing the respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.

"93.	The respondent put the proposed plan of probation into effect prior to the hearing on the formal complaint by complying with the terms and conditions of the probation plan. The respondent has hired an accounting firm to reconcile his accounts, testified that he has made the changes to his trust accounting process as recommended by Ms. Dillon with the OCDC, and, when available, will attend additional CLE's on trust accounting to continue to improve his understanding of this process. Further, since the respondent implemented these new accounting procedures, there is no evidence that the respondent has experienced further issues with his trust account. The hearing panel concludes that the actions taken by the respondent thus far, combined with the actions the respondent will take under his proposed probation plan when he is able to, are sufficient to meet the requirements of Rule 227.

"94.	While the hearing panel concludes that the probation plan meets the requirements of Rule 227, the hearing panel further recommends that the respondent be required to undergo a full audit, performed by a qualified accountant, that compares the respondent's client settlement statements to the respondent's trust account bank statements within the first year of probation and on an annual basis thereafter. This comparison of the respondent's trust account bank transactions to the client settlement statements will help ensure that the respondent's clients and the third-party lienholders receive the funds to which they are entitled and that the respondent is withdrawing the exact amount of earned fees to which he is entitled. Proof of the annual audits should be provided to the practice supervisor and to the disciplinary administrator's office.

"95. Further, the hearing panel recommends that it be a condition of the respondent's probation that the respondent be required to complete the 'Fundamentals of Trust Accounting' class recommended by the OCDC in 2010 and 2011. If this class is no longer available, the respondent should complete an equivalent class as approved by the disciplinary administrator's office. The respondent should also be required to read the 'Kansas Lawyer Trust Account Handbook,' published by the disciplinary administrator's office in September 2023, and provide written confirmation to the disciplinary administrator's office that he has read it within 90 days of the start of probation.

"*Recommendation of the Hearing Panel*

"96. Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of one (1) year. The hearing panel further recommends that the suspension be stayed and the respondent be placed on probation for a period of two (2) years according to the terms of the respondent's proposed probation plan, adding the suggestions of the hearing panel regarding auditing, completing the 'Fundamentals of Trust Accounting' class, and reading the trust account handbook discussed above.

"97. Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In an attorney disciplinary proceeding, the court considers the evidence, the panel's findings, and the parties' arguments and determines whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Spiegel*, 315 Kan. 143, 147, 504 P.3d 1057 (2022); see Supreme Court Rule 226(a)(1)(A) (2024 Kan. S. Ct. R. at 279). Clear and convincing evidence is evidence that causes the fact-finder to believe that the truth of

19

the facts asserted is highly probable. *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020).

A finding is considered admitted if exception is not taken. When exception is taken, the finding is typically not deemed admitted so the court must determine whether it is supported by clear and convincing evidence. *In re Hodge*, 307 Kan. 170, 209-10, 407 P.3d 613 (2017). If so, the finding will not be disturbed. The court does not reweigh conflicting evidence, assess witness credibility, or redetermine questions of fact when undertaking its factual analysis. *In re Hawver*, 300 Kan. 1023, 1038, 339 P.3d 573 (2014).

The respondent was given adequate notice of the formal complaint and timely responded. The respondent was also given adequate notice of the hearing before the panel and the hearing before this court. He did not file exceptions to the hearing panel's final hearing report.

With no exceptions before us, the panel's factual findings and conclusions of law are deemed admitted by the respondent and ODA. Supreme Court Rule 228(g)(1), (2) (2024 Kan. S. Ct. R. at 285). We agree with the panel in holding that respondent violated KRPC 1.8 (conflict of interest: current clients: specific rules), and KRPC 1.15 (safekeeping property).

The only remaining issue is to decide the appropriate discipline for these violations. The hearing panel recommended the respondent be suspended for a period of one year. The hearing panel further recommended that the suspension be stayed and the respondent be placed on probation for a period of two years according to the terms of the respondent's proposed probation plan, adding the suggestions of the hearing panel regarding auditing, completing the "Fundamentals of Trust Accounting" class, and

20

reading the trust account handbook discussed above. After the hearing panel entered its recommendations, the respondent submitted an amended probation plan that now includes additional safeguards, structured practice supervision, and required audits and reporting of respondent's trust accounts that addresses the panel's concerns. At oral presentation before this court, the parties agreed to a two-year suspension and that the suspension be stayed and the respondent be placed on probation for a period of two years according to the terms of the respondent's proposed amended probation plan.

This court is not bound by any recommendations. *In re Long*, 315 Kan. 842, 853, 511 P.3d 952 (2022). The court is cognizant that "'[o]ur primary concern must remain protection of the public interest and maintenance of the confidence of the public and the integrity of the Bar.' [Citation omitted.]" *In re Jones*, 252 Kan. 236, 241, 843 P.2d 709 (1992).

After considering the evidence presented, all recommendations, and aggravating and mitigating circumstances, we conclude appropriate discipline is that the respondent be suspended for a period of two years. The suspension is stayed conditioned on respondent's successful performance and completion of two years' probation, subject to the terms and conditions of the amended probation plan.

Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Darren E. Fulcher is suspended for a period of two years, effective the date of this opinion, in accordance with Supreme Court Rule 225(a)(3) (2024 Kan. S. Ct. R. at 278) for violations of KRPC 1.8 and 1.15. The

suspension is stayed conditioned upon Fulcher's successful participation and completion of a two-year probation period. Probation will be subject to the terms set out in the amended probation plan. No reinstatement hearing is required upon successful completion of probation.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.