IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 128,062

In the Matter of ALEJANDRO J. SOLORIO,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral arguments held December 11, 2024. Opinion filed December 27, 2024. One-year suspension, stayed after 90 days, conditioned upon successful participation and completion of nine-month probation period.

*Kate Duncan Butler*, Deputy Disciplinary Administrator, argued the cause and was on the formal complaint for the petitioner.

*Richard G. Guinn*, of Colantuono Guinn Keppler LLC, of Overland Park, argued the cause, and *Alejandro J. Solorio*, respondent, argued the cause pro se.

PER CURIAM: This is an attorney discipline proceeding against Alejandro J. Solorio, of Mission. Solorio was admitted to practice law in Kansas on April 28, 2000. The following summarizes the history of this case before the court.

After the Office of the Disciplinary Administrator (ODA) filed a formal complaint against respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC), Solorio timely responded. In due course, respondent filed a proposed probation plan. On May 28, 2024, respondent entered into a joint agreement with the Disciplinary Administrator's office stipulating to violations of KRPC 1.1 (competence) (2024 Kan. S. Ct. R. at 324), KRPC 1.3 (diligence) (2024 Kan. S. Ct. R. at 328), KRPC 1.4 (communication) (2024 Kan. S. Ct. R. at 329), and KRPC 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation) (2024 Kan. S. Ct. R. at 430).

1

Respondent personally appeared and was represented by counsel at the complaint hearing before a panel of the Kansas Board for Discipline of Attorneys, which was conducted on June 25, 2024. After the hearing, the panel determined that respondent had violated KRPC 1.1, KRPC 1.3, KRPC 1.4, and KRPC 8.4(c). The panel set forth its findings of fact and conclusions of law, along with its recommendation on disposition, in a final hearing report, the relevant portions of which are set forth below.

"*Findings of Fact*

"18.    The hearing panel finds the following facts, by clear and convincing evidence:

"19.    In June 2022, A.E. and J.E., a married couple, filed complaints against the respondent along with their attorney, K.H. The complaint stems from the respondent's representation of A.E. and J.E. in an immigration matter.

"20.    A.E. and J.E. originally retained the respondent in 2009 for assistance in their applications for U nonimmigrant status with United States Citizenship and Immigration Services ('USCIS'). U nonimmigrant status is valid for four years. Provided they meet certain requirements, individuals with this status may request an adjustment to lawful permanent resident status. The individual must still hold U nonimmigrant status at the time they request this adjustment.

"21.    USCIS granted A.E. and J.E. U nonimmigrant status with an expiration date of July 13, 2014.

"22.    In March 2014, and in anticipation of this expiration date, A.E. and J.E. hired the respondent to file an adjustment of status from U nonimmigrant to lawful permanent residence. Despite meeting with A.E. and J.E. in March, the respondent failed to file their adjustments until August 1, 2014, which was two weeks after their U nonimmigrant status had expired and after the deadline to file. In October 2014, A.E. and J.E. were issued an extension of their work visa cards. The respondent assumed that no

2

further action was required to extend A.E. and J.E.'s existing status past the expiration date and that their requests for adjustments would be granted despite his late filing. The respondent took no additional effort to extend A.E. and J.E.'s existing status past the expiration date.

"23.     The respondent acknowledged during his testimony that he missed the deadline and filed his clients' application two weeks late. The respondent testified that he misplaced the clients' file after he met with them in March 2014 and did not discover his error until the deadline had passed. Despite missing the deadline, he hoped that their application for adjustment of status would be granted.

"24.     Because they no longer held U nonimmigrant status at the time of filing, USCIS denied A.E. and J.E.'s requests for adjustments on February 19, 2015.

"25.     Because the respondent filed the application, albeit late, the clients' work status was automatically extended for one year. However, in October 2015, the clients received notice that their work authorization expired.

"26.     The respondent met with A.E. and J.E. within a few weeks of their applications being denied. During the meeting, he informed them of the denial, but he did not tell them the reason for the denial—namely, that he filed the requests too late.

"27.     From approximately February 2015 to June 2022, the respondent reassured A.E. and J.E. that he continued to work on their adjustments to lawful permanent resident status. The respondent believed that once the immigration court learned of the reasons for the denial (specifically, his late filings), an order would be issued placing A.E. and J.E. on the court docket for consideration of being granted permanent status.

"28.     The respondent testified that he expected, based on his experience in past cases, that once the clients' application was denied due to the late filing, that their case would be referred to the immigration court. The respondent said that this was what he hoped for, because it was the only opportunity he saw to explain the clients' situation to immigration officials. Both the respondent and Ted Garcia, the respondent's proposed

practice supervisor and also a longtime immigration law practitioner, testified that there would have been no way to present evidence of the clients' circumstances to immigration officials without a hearing before the immigration court.

"29.     The respondent believed that his clients had a very good case for being allowed to remain in the U.S. lawfully. Mr. Garcia agreed with the respondent's assessment, testifying during the formal hearing that the following factors nearly guaranteed that the respondent's clients would be allowed to remain in the U.S.:  (1) the clients had been present in the Unite[d] States for a sufficient amount of time; (2) the clients had good moral character and no arrests; (3) the clients had family who are United States citizens; and (4) the clients had a qualifying hardship. Mr. Garcia testified that most prosecutors would stipulate under these conditions and that it would be highly unusual for any immigration court to not grant cancellation of removal from the U.S., putting the clients back on track to apply for change of status.

"30.     Due to significant delays in the immigration system, the respondent expected it could take as many as two years for A.E. and J.E. to receive notice to appear at a hearing before an immigration judge.

"31.     Since A.E. and J.E. were never issued notices to appear, the respondent considered surrendering A.E. and J.E. to Immigration Customs Enforcement ('ICE') to place them in proceedings before an immigration court. However, based on the outcome of the 2016 presidential election and the new administration's stance on immigration, the respondent believed that surrendering A.E. and J.E. to ICE would have potentially resulted in a lengthy detention and potential removal from the United States because of their lack of legal immigration status. For that reason, he did not recommend to A.E. and J.E. that they surrender to authorities. The respondent did not complete additional affirmative work on the adjustments.

"32.     On September 14, 2018, the respondent had A.E. and J.E. complete a second set of requests for adjustments, telling them in a voicemail that he had submitted them and needed to find out the case number. The respondent did not file these requests because he believes they would also be denied. He did not tell A.E. and J.E. about this decision.

4

"33.    In another voicemail, the respondent informed A.E. and J.E. he had spoken to USCIS personnel about their cases. He had not.

"34.    Part of the respondent's reason for inaction was that he believed A.E. and J.E.'s cases would be docketed for hearing. When the allotted time passed without a hearing being set, he did not take affirmative steps to set a hearing or resolve the issue.

"35.    The respondent also believed that he might be able to involve ICE to assist with the adjustments. However, due to the COVID-19 pandemic, between the period of March 2020 through August 2021, the Kansas City ICE office limited their services to only address individuals who were detained. To approach ICE with the request during this period would have been summarily rejected since A.E. and J.E. were not detained.

"36.    The respondent did not refer A.E. and J.E. to another attorney in this time period even though he came to believe they could successfully reapply with different counsel because new counsel could more effectively argue that A.E. and J.E.'s failure to timely file their adjustments was due to the respondent's failure to provide diligent representation. The respondent believed A.E. and J.E. retained alternate counsel based upon their letter to him dated May 7, 2020, which requested a copy of his file.

"37.    A.E. and J.E. eventually investigated the issue independently and discovered that they no longer had a pending case before USCIS.

"38.    In 2022, A.E. and J.E. hired K.H. to represent them. K.H. filed a Freedom of Information Act ('FOIA') request on their behalf and learned why the applications had been denied and that no additional efforts had been made in their cases.

"39.    Because of the respondent's conduct, A.E. and J.E. lost the benefits associated with U nonimmigrant status, including their ability to work legally in the United States. This conduct seriously delayed their ability to become lawful permanent residents and eventually citizens if they choose to do so and pass the exam. Since retaining new counsel, A.E. and J.E. have regained lawful temporary status in the United

States. They have also again requested an adjustment to lawful permanent resident status. Based on current information from USCIS, it is unlikely that J.E. and A.E. will learn whether their requests have been approved until 2025. A.E. and J.E. have also reapplied for work authorization and are waiting for their work visa cards.

"40.    Based on the above-stipulated facts, the respondent stipulates that his conduct violated the following Kansas Rules of Professional Conduct: KRPC 1.1 (competence); KRPC 1.3 (diligence); KRPC 1.4 (communication); and KRPC 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation).

"*Conclusions of Law*

"41.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.1 (competence); 1.3 (diligence); 1.4 (communication); and 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation), as detailed below.

"KRPC 1.1

"42.    Attorneys must provide competent representation to their clients. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' KRPC 1.1.

"43.    The respondent did not act competently on his clients' behalf, as he acknowledged that he set their file to the side and forgot about their case until two weeks after the deadline to file the adjustment of status had passed.

"44.    The respondent stipulated that his conduct violated KRPC 1.1.

"45.    Accordingly, the hearing panel concludes that the respondent violated KRPC 1.1.

"KRPC 1.3

"46.     Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3.

"47.     The respondent failed to diligently and promptly represent his clients by failing to file the application for change of status on their behalf prior to the July 2014 deadline.

"48.     The respondent stipulated that his conduct violated KRPC 1.3.

"49.     Accordingly, the hearing panel concludes that the respondent violated KRPC 1.3.

"KRPC 1.4

"50.     KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' Further, according to KRPC 1.4(b), '[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.'

"51.     The respondent failed to fully inform his clients about the reason for the denial of their application for change of status. Further, the respondent failed to clarify that the denial of their application was due to his filing the application late. Finally, the respondent failed to communicate with his clients regarding his strategy for not taking action in their immigration case due to external intervening factors, such as delays in the immigration court issuing a notice to appear, COVID-19 delay, and the change of presidential administration and, thus, change of executive branch policy regarding immigration.

"52.     The respondent stipulated that his conduct violated KRPC 1.4.

7

"53.    Accordingly, the hearing panel concludes that the respondent violated KRPC 1.4.

"KRPC 8.4(c)

"54.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c).

"55.    The respondent engaged in conduct involving misrepresentation and dishonesty when from 2015 on he told A.E. and J.E. that he continued to work on their adjustments to lawful permanent resident status when he did not, telling them in a voicemail that he had submitted a second set of requests for adjustments when he had not, and telling his clients that he had spoken to USCIS personnel about their case when he had not.

"56.    The respondent stipulated that his conduct violated KRPC 8.4(c).

"57.    Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"*American Bar Association
Standards for Imposing Lawyer Sanctions*

"58.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"59.    *Duty Violated*. The respondent violated his duty to his clients, A.E. and J.E.

8

"60.     *Mental State*. The respondent negligently violated the duty of competence and the duty of diligence. The respondent knowingly violated the duty of honesty.

"61.     *Injury*. The respondent's failure to act competently and diligently by timely filing his clients' application for change of status caused significant injury to the clients, who lost their lawful status and work authorization in the United States as a result.

"62.     In addition to the above-cited factors in Standard 3, the hearing panel has thoroughly examined and considered the following Standards:

'4.42     Suspension is generally appropriate when:

'(a)      a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

'(b)      a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.'

'4.43     Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.'

'4.53     Reprimand is generally appropriate when a lawyer:

'(a)      demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or

'(b)      is negligent in determining whether he or she is competent to handle a legal matter and causes injury or potential injury to a client.'

'4.62    Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client.'

'4.63    Reprimand is generally appropriate when a lawyer negligently fails to provide a client with accurate or complete information, and causes injury or potential injury to the client.'

"Aggravating and Mitigating Factors

"63.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following with regard to aggravating factors:

"64.    *Vulnerability of Victim*. A.E. and J.E. were vulnerable to the respondent's misconduct as immigrants under U nonimmigration status, and later were made more vulnerable when their application for permanent residence was filed late and denied as a result. This is an aggravating factor.

"65.    *Pattern of Misconduct*. The respondent's dishonesty was ongoing. The respondent continued to be dishonest with his clients and failed to communicate important information about their case for years. This is an aggravating factor.

"66.    *Substantial Experience in the Practice of Law*.  The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 2000. At the time of the misconduct, the respondent had been practicing law for approximately 15 years. The hearing panel concludes that the respondent had substantial experience in the practice of law when the misconduct occurred and that this is an aggravating factor.

"67.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

10

"68.    *Absence of a Prior Disciplinary Record*. The respondent has not been previously disciplined. This is a mitigating factor.

"69.    *Remorse*. At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct. He fully understood the negative consequences his misconduct caused for his former clients and expressed that he would do things differently if he were able to go back and do everything over again. This is a mitigating factor.

"70.    *Absence of Dishonest or Selfish Motive*. The respondent's initial failure to timely file his clients' adjustments was not motivated by dishonesty or selfishness. While the respondent's conduct in failing to inform his clients of his mistake involved dishonesty to his clients, the hearing panel concludes that his motive was to prevent his clients from feeling increased anxiety and fear about a situation over which they had virtually no control. This is a mitigating factor.

"71.    *Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct*. The respondent refunded the fee paid to him by A.E. and J.E. and settled a malpractice claim filed by them through his malpractice insurance provider. The respondent's effort to make restitution and resolve the consequences of his misconduct is a mitigating factor.

"72.    *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions*. The respondent has cooperated in the disciplinary process, as evidenced in part by his entry into a joint stipulation to facts and that his conduct violated KRPC 1.1, 1.3, 1.4, and 8.4(c). The disciplinary administrator agreed that the respondent was cooperative in the disciplinary process. The hearing panel concludes that this is a mitigating factor.

"73.    *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the immigration bar and his community in Kansas City, Kansas. The respondent also enjoys

11

the respect of his peers and his clients as shown by the testimony of Ted Garcia and through letters received by the hearing panel. The hearing panel concludes that this is a mitigating factor.

"*Recommendation of the Parties*

"74.     The disciplinary administrator recommended that the respondent's license be suspended for a period of one year. The disciplinary administrator further recommended that after the respondent has served 90 days of the suspension, the remaining nine months of the suspension be stayed, and the respondent be placed on probation for 18 months.

"75.     The respondent recommended that he be suspended for six months, with an immediate stay of the suspension while the respondent is placed on probation for 18 months according to the terms of his proposed plan of probation.

"*Discussion*

"76.     While the hearing panel reviewed ABA Standard 4.6, the panel concludes, based on the evidence presented, that this standard does not apply in this case. Application of ABA Standard 4.6 requires evidence that the lawyer's dishonest or deceptive conduct 'causes injury or potential injury to the client.'

"77.     The hearing panel heard evidence that A.E. and J.E. 'lost the benefits associated with U nonimmigrant status, including their ability to work legally in the United States.' Further, the respondent's conduct 'seriously delayed [A.E. and J.E.'s] ability to become lawful permanent residents and eventually citizens if they choose to do so and pass the exam.'

"78.     The deadline for A.E. and J.E. to file for permanent residency in the United States was in mid-July 2014. The respondent acknowledged during his testimony that he missed the deadline and filed his clients' application two weeks late. The respondent said that he misplaced the clients' file after he met with them in March 2014 and did not discover his error until the deadline had passed.

12

"79.     The respondent expected, based on his experience in past cases, that once the clients' application was denied due to the late filing, that their case would be referred to the immigration court. The respondent said that this was what he hoped for, because it was the only opportunity he saw to explain his fault with the late filing and the clients' situation to immigration officials. Both the respondent and Mr. Garcia, both longtime immigration law practitioners, testified that there would have been no way to present evidence of this to immigration officials without a hearing before the immigration court.

"80.     The respondent believed that his clients had a very good case for being allowed to remain in the U.S. lawfully. Mr. Garcia agreed with the respondent's assessment, testifying during the formal hearing that the four factors discussed above nearly guaranteed that the respondent's clients would be allowed to remain in the U.S. Mr. Garcia testified that most prosecutors would stipulate under these conditions and that it would be highly unusual for any immigration court to not grant cancellation of removal from the U.S.

"81.     Due to significant delays in the immigration system, the respondent expected it could take as many as two years for A.E. and J.E. to receive notice to appear at a hearing before an immigration judge.

"82.     In the meantime, 2016 was a presidential election year. The president of the United States oversees and directs the executive branch's enforcement of U.S. immigration laws and policies. The new presidential administration took an approach to immigration matters that resulted in greater risk for extended detentions and removal for persons like the respondent's clients. Further, the COVID-19 pandemic caused additional delays in the immigration system.

"83.     The respondent analyzed theses new circumstances and concluded that there was a significant possibility that if he recommended that A.E. and J.E. surrender themselves to immigration authorities, they would be detained for an extended period of time before their case could be heard by the immigration court. A.E. and J.E. had minor children, who were U.S. citizens, at home at this time.

"84. The respondent felt that his clients' immigration case was between a rock and a hard place. He felt the two choices before the clients were to (1) surrender to immigration officials and be detained for an extended period or be deported from the country, leaving their minor children without both of their parents, or (2) to wait and hope that the current presidential administration changed and enforcement of immigration regulations returned to the procedures the respondent had seen in the past. Return to past immigration procedures would allow for a hearing before the immigration court, offering his clients an opportunity to present what the respondent believed was a very good case for remaining in the U.S. and getting back on track for eventually obtaining permanent residence status.

"85. The respondent's failure to communicate the true situation to his clients, and his dishonest statements that misled them for years, constituted misconduct and was unacceptable. A.E. and J.E. should have been told the truth about the respondent's mistake in filing their application late and should have been able to make decisions about their case moving forward with full knowledge of the circumstances surrounding their case. The dishonesty, however, did not cause the clients' injury.

"86. Rather, the evidence presented at the formal hearing showed that the fundamental injury to the clients' immigration case resulted from the respondent's late filing of their application, which constituted violations of KRPC 1.1 and 1.3. This injury was then exacerbated by circumstances outside of the respondent's control, such as delays in the immigration authorities sending the clients a notice to appear before the immigration court, COVID-19 delays, and a change in the presidential administration and, thus, the executive branch policy on immigration. There was no evidence that, had the respondent accurately communicated to A.E. and J.E. the circumstances resulting in the denial of their application, the resulting delay in their change of immigration status would have been shorter.

"87. Also, the hearing panel concludes that the respondent did not mislead his clients for selfish reasons. The respondent saw an impossible situation before his clients and did not want them to experience anxiety about their situation. Further, he did not

14

want his clients to lose hope before he could get their case in front of the immigration court. The respondent testified that he understands that despite his good intentions, it was wrong for him not to fully disclose all of the information about the case to A.E. and J.E.

"88.     The hearing panel concludes that the appropriate standards to apply in this case are ABA Standards 4.43 and 4.53:

'4.43     Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.'

'4.53     Reprimand is generally appropriate when a lawyer:

'(a)     demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or

'(b)     is negligent in determining whether he or she is competent to handle a legal matter and causes injury or potential injury to a client.'

"89.     The hearing panel concludes that ABA Standard 4.42 does not apply because the evidence showed the respondent's failure to timely file his client's application was a single mistake caused by misplacing the clients' file and not noticing his error until the filing deadline had passed. This misconduct was not knowing and was not the result of a pattern of neglect but instead a single occurrence of neglect. Additionally, while the respondent should have communicated his strategy to his clients, the respondent's decision to not take action in the clients' case after the late application filing was an appropriate strategic response to external factors outside of the respondent's control.

"90.     Finally, the hearing panel concludes that the respondent was negligent in failing to provide his clients with accurate information about their case. His intentions may have been to help his clients feel less anxiety about what seemed to the respondent

15

to be an impossible situation, but the clients were entitled to know the full truth about their case. ABA Standard 4.63 states that reprimand is generally appropriate under these circumstances.

"*Recommendation of the Hearing Panel*

"91.    Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be censured and that the censure be published in the Kansas Reports.

"92.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In an attorney disciplinary proceeding, the court considers the evidence, the panel's findings, and the parties' arguments and determines whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Spiegel*, 315 Kan. 143, 147, 504 P.3d 1057 (2022); see Supreme Court Rule 226(a)(1)(A) (2024 Kan. S. Ct. R. at 279). Clear and convincing evidence is evidence that causes the fact-finder to believe that the truth of the facts asserted is highly probable. *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020).

A finding is considered admitted if exception is not taken. When exception is taken, the finding is typically not deemed admitted so the court must determine whether it is supported by clear and convincing evidence. *In re Hodge*, 307 Kan. 170, 209-10, 407 P.3d 613 (2017). If so, the finding will not be disturbed. The court does not reweigh conflicting evidence, assess witness credibility, or redetermine questions of fact when undertaking its factual analysis. *In re Hawver*, 300 Kan. 1023, 1038, 339 P.3d 573 (2014).

The respondent was given adequate notice of the formal complaint and timely responded. The respondent was also given adequate notice of the hearing before the panel and the hearing before this court. He did not file exceptions to the hearing panel's final hearing report.

With no exceptions before us, the panel's factual findings and conclusions of law are deemed admitted by the respondent and ODA. Supreme Court Rule 228(g)(1), (2) (2024 Kan. S. Ct. R. at 285). We agree with the panel in holding that respondent violated KRPC 1.1 (competence), KRPC 1.3 (diligence), KRPC 1.4 (communication), and KRPC 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation).

The only remaining issue is to decide the appropriate discipline for these violations. The hearing panel recommended the respondent be censured and that the censure be published in the Kansas Reports. The Disciplinary Administrator recommended that Solorio be suspended for a period of one year and that after respondent has served 90 days of the suspension, the remaining nine months be stayed, and the respondent be placed on probation for 18 months. The respondent argued for a 6-month suspension immediately stayed while the respondent is placed on probation for 18 months.

This court is not bound by any recommendations. *In re Long*, 315 Kan. 842, 853, 511 P.3d 952 (2022). The court is cognizant that "'[o]ur primary concern must remain protection of the public interest and maintenance of the confidence of the public and the integrity of the Bar.' [Citation omitted.]" *In re Jones*, 252 Kan. 236, 241, 843 P.2d 709 (1992).

After considering the evidence presented, all recommendations, and aggravating and mitigating circumstances, we adopt the Disciplinary Administrator's recommendation

17

with a slight modification in the length of the term of probation. We note the hearing panel's conclusion that respondent's deception in not disclosing to his clients his failure to file their adjustments to immigration status would typically result in public reprimand, but several factors here have compounded the gravity of the violation independent of the initial deception.

First, the nearly eight-year duration of the repeated dishonesty unnecessarily prolonged harm to especially vulnerable clients. Second, the nature of the deception in failing to disclose the basis for the denial of A.E. and J.E.'s legal immigration status prevented A.E. and J.E. from being fully informed and autonomous decision makers regarding their legal status. Paragraph 36 of the hearing panel's findings exemplifies the impact of this harm by explaining the respondent did not refer A.E. and J.E. to another attorney even though he believed they could successfully reapply with different counsel who could more effectively argue the failure to timely file their adjustments was due to the respondent's lack of diligent representation. This clearly deprived A.E. and J.E. of their ability to be fully informed in considering the best legal avenue to pursue their claims.

We conclude the appropriate discipline is that the respondent be suspended for a period of one year. After the respondent has served 90 days of the suspension, the respondent will be placed on probation for the remaining 9 months, subject to the terms and conditions of the amended probation plan. No reinstatement hearing is required upon successful completion of probation.

Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Alejandro J. Solorio is suspended for a period of one year, effective the date of this opinion, in accordance with Supreme Court Rule 225(a)(3) (2024 Kan. S. Ct. R. at 278) for violations of KRPC 1.1, 1.3, 1.4, and 8.4(c). After 90 days, the suspension is stayed conditioned upon Solorio's successful participation and completion of a 9-month probation period. Probation will be subject to the terms set out in the amended probation plan. No reinstatement hearing is required upon successful completion of probation.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.